994 A.2d 842

MARYLAND RECLAMATION ASSOCIATES, INC.

v.

HARFORD COUNTY, Maryland, et al.

Maryland Reclamation Associates, Inc.

v.

Harford County, Maryland, et al.

Nos. 143, 144 Sept.Term, 2008.

Court of Appeals of Maryland.

March 11, 2010.

Reconsideration Denied May 7, 2010.

2

4

6

Susan T. Ford (James P. Nolan of Council, Baradel, Kosmerl & Nolan, P.A., Annapolis, MD; William D. Hooper of Hooper & Jacobs, L.L.C., Bel Air, MD), on brief for Appellant.

Jennifer M. Schwartzott (Miles & Stockbridge, P.C., Baltimore, MD; Nancy Giorno of Harford County Dept. of Law, Bel Air, MD; Sherrilyn Ifill of University of Maryland School of Law, Baltimore, MD; and Lisa Sheehan of People's Counsel, Forest Hill, MD), all on brief for appellee.

Nancy Giorno (Harford County Dept. of Law, Bel Air, MD; Sherrilyn Ifill of University of Maryland School of Law, Baltimore, MD; Lisa Sheehan of People's Counsel, Forest Hill, MD; and Jennifer M. Schwartzott of Miles & Stockbrigge, P.C., Baltimore, MD), all on brief for Appellee.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, Judge.

In this opinion we address two appeals filed by Appellant Maryland Reclamation Associates ("MRA") involving a sixty-eight acre agriculturally zoned property located in Harford County Maryland ("Property") on which MRA seeks to construct and operate a rubble landfill. This rubble landfill has been highly controversial and the litigation involving this Property has spanned over ten years. It now reaches this Court for the third time.[1] Among other contentions, MRA asks this Court to adopt the doctrine of zoning estoppel, and hold that Harford County is estopped from applying an amendment to its zoning code that would render the Property ineligible for use as a rubble landfill.

The two appeals include: (1) Case No. 143, an appeal from a September 3, 2008 judgment of the Circuit Court for Harford County affirming the Harford County Board of Appeals's ("Board") denial of MRA's request for several variances from applicable zoning regulations that will allow it to build a rubble landfill, and (2) Case No. 144, an appeal from an October 22, 2003 judgment of the Circuit Court for Harford County affirming the Harford County Board of Appeals's interpretation of various zoning provisions applicable to MRA. The Appellees are Harford County as well as a group of individuals, represented by People's Counsel, who live in the neighborhood surrounding the proposed rubble landfill and are opposed to its development ("Protestants").

In order to resolve the issues in these appeals, we must understand the history of the various administrative proceedings and earlier appeals. Knowing this task is decidedly

---

1. Previous attempts to appeal to this Court were met with dismissal of certiorari or remand to the lower court for exhaustion of administrative remedies. *See Holmes v. Md. Reclamation Assocs., Inc.*, 90 Md.App. 120, 600 A.2d 864 (1992), *cert. dismissed sub nom. County Council of Harford County v. Md. Reclamation Assocs., Inc.*, 328 Md. 229, 614 A.2d 78 (1992) ("MRA I"); *Md. Reclamation Assocs., Inc. v. Harford County*, 342 Md. 476, 677 A.2d 567 (1996) ("MRA II"); *Md. Reclamation Assocs., Inc. v. Harford County*, 382 Md. 348, 855 A.2d 351 (2004) ("MRA III").

tedious, we have done our best to be concise. Judge Eldridge, formerly an active member of this Court, helps us with this task.

## FACTS AND LEGAL PROCEEDINGS

In *MRA II*, Judge Eldridge detailed the following history:

In August 1989, the plaintiff-appellant, Maryland Reclamation Associates, Inc., contracted to purchase property located adjacent to Gravel Hill Road in Harford County, Maryland. Maryland Reclamation intended to construct and operate a rubble landfill on this property; thus, it began the process of obtaining a rubble landfill permit from the Maryland Department of the Environment pursuant to Maryland Code (1982, 1996 Repl. Vol), §§ 9–204 through 9–210, §§ 9–501 through 9–521 of the Environment Article, and COMAR 26.03 through 26.04.

Maryland Reclamation first requested that Harford County include the Gravel Hill Road property in Harford County's Solid Waste Management Plan as a rubble landfill. Thereafter, Harford County amended its Solid Waste Management Plan to include Maryland Reclamation's Gravel Hill Road site as a rubble landfill. The property's inclusion in the Harford County Solid Waste Management Plan, however, was made subject to twenty-seven conditions, including a minimum landscape buffer of 200 feet. On November 16, 1989, Harford County advised the Maryland Department of the Environment that Maryland Reclamation's Gravel Hill Road property had been included in the County's Solid Waste Management Plan as a rubble landfill site.

Maryland Reclamation next sought approval at the state government level from the Department of the Environment. On November 20, 1989, Maryland Reclamation received Phase I permit approval from the Department of the Environment. Maryland Reclamation then filed with the Department the necessary reports and studies for Phase II and Phase III approvals.

[M]aryland Reclamation had entered into a contract to purchase the property located adjacent to Gravel Hill Road in August 1989, before its inclusion in Harford County's Solid Waste Management Plan. Allegedly relying on the property's inclusion in Harford County's Solid Waste Management Plan and on the Department of the Environment's Phase I approval, Maryland Reclamation consummated the purchase of the Gravel Hill Road property on February 9, 1990, for $732,500. The settlement occurred on the last possible day under the terms of the contract of sale.

Four days after the settlement date, newly appointed Harford County Council President Jeffrey D. Wilson and Council Member Joanne Parrott introduced in the County Council Resolution 4-90, which provided for the removal of Maryland Reclamation's property from the County's Solid Waste Management Plan. [Footnote 1 omitted] In the litigation that ensued over this resolution, [2] the Court of Special Appeals held that Resolution 4-90 was invalid because it was preempted by the State's authority over solid waste management plans and the issuance of rubble landfill permits. *[MRA I]*, 90 Md.App. 120, 600 A.2d 864, *cert. dismissed sub nom. County Council v. Md. Reclamation,* 328 Md. 229, 614 A.2d 78 (1992). [Footnote 2 omitted.]

While the litigation over Resolution 4-90 was pending, Bill 91-10 was introduced in the Harford County Council, on February 12, 1991, as an emergency bill. Bill 91-10 proposed to amend the requirements for a rubble landfill by increasing the minimum acreage requirements, buffer requirements, and height requirements. The bill, *inter alia,* would establish a minimum rubble fill size of 100 acres and a buffer zone of 1000 feet. After public hearings, the County Council passed the bill on March 19, 1991, and the County Executive signed the bill into law on March 27, 1991. [Footnote 3 omitted.]

On April 2, 1991, Bill 91-16 was introduced in the Harford County Council. This bill would authorize the County

---

2. This litigation culminated in the *MRA I* decision.

Council to remove a specific site from the County's Solid Waste Management Plan if the site does not comply with certain zoning ordinances, if a permit has not been issued by the State Department of the Environment within eighteen months of the site being placed in the County's Solid Waste Management Plan, or if the owner of the site has not placed the site in operation within the same eighteen month period. Bill 91–16 was passed by the County Council, signed into law by the County Executive on June 10, 1991, and is codified as § 109–8.4 of the Harford County Code. [Footnote 4 omitted.]

The President of the Harford County Council, on April 25, 1991, sent a letter to the State Department of the Environment, enclosing a copy of enacted Bill 91–10, and advising the Department that the provisions of the bill could call into question the status of sites which were in the process of obtaining rubble landfill permits. On May 2, 1991, the Department of the Environment advised the County Council that if a permit were to be issued to Maryland Reclamation, such issuance would not authorize Maryland Reclamation to violate any local zoning or land-use requirements.

Also on May 2, 1991, the County's Director of Planning sent a letter to Maryland Reclamation informing it of Bill 91–10, indicating that Maryland Reclamation's property would apparently fail to meet the requirements of Bill 91–10, stating that Maryland Reclamation should submit documentation showing that the Gravel Hill Road site could meet the requirements of the zoning ordinances, and stating that, if the site could not meet such requirements, Maryland Reclamation would need a variance to operate a rubble landfill on the property. Maryland Reclamation did not submit any documents pursuant to the May 2, 1991, letter and did not file an application for a variance. [Footnote 5 omitted.] Maryland Reclamation did file on May 21, 1991, an "appeal" to the Harford County Board of Appeals from the "administrative decision pursuant to Section 267-7 E in a letter dated 5/2/91," requesting that the Board "review

and reverse the decision of the Zoning Administrator interpreting that the standards of Council Bill 91–10 apply to the Applicant." The "application" to the Board of Appeals asserted that Bill 91–10 was inapplicable to the property and that, if it was applicable, it was invalid. [Footnote 6 omitted.]

On May 14, 1991, Resolution 15–91 was introduced in the Harford County Council. This resolution purported to interpret Harford County law and determine that the Gravel Hill Road site was not in compliance with county law; the resolution went on to remove the site from the County's Solid Waste Management Plan. The County Council passed Resolution 15–91 on June 11, 1991. The resolution was apparently not submitted to the County Executive for his approval.

Maryland Reclamation on June 20, 1991, filed a complaint in the Circuit Court for Harford County, seeking a Declaratory Judgment and Injunctive Relief against Harford County and the Harford "County Council." Maryland Reclamation requested, *inter alia,* the following: (1) a declaration that Bills 91–10 and 91–16, as well as Resolution 15–91, are "null and void as to the Gravel Hill Site;" (2) an injunction preventing the County from enforcing Bills 91–10 and 91–16 and Resolution 15–91 against Maryland Reclamation; and (3) an injunction staying all further action on Maryland Reclamation's "appeal" to the Board of Appeals. Maryland Reclamation advanced numerous legal theories to support its complaint for declaratory and injunctive relief.

The circuit court on June 28, 1991, issued an interlocutory injunction preventing enforcement of Bills 91–10, 91–16, and Resolution 15–91 against Maryland Reclamation. The order expressly allowed the Department of the Environment to continue its processing of Maryland Reclamation's pending permit application. The order also stayed the processing of Maryland Reclamation's administrative "appeal" from the Director of Planning's "decision" contained in the Director's May 2, 1991, letter. Finally, the interlocutory order prohib-

ited Maryland Reclamation from starting any construction without court approval.

On February 28, 1992, the State Department of the Environment issued to Maryland Reclamation a permit to operate a rubble landfill on its property. The Department expressly conditioned the permit upon Maryland Reclamation's compliance with all local land-use requirements. [Footnote 7 omitted.]

Upon cross-motions for summary judgment, the circuit court on May 19, 1994, filed an opinion and judgment, declaring that Harford County was entitled to enact new zoning laws that may prevent Maryland Reclamation from operating a rubble landfill, and that Bills 91–10 and 91–16 were not invalid on the grounds asserted by the plaintiff. The court, however, declared that Resolution 15–91 was invalid on its face. According to the circuit court, the Harford County Council was acting as a legislative body when it passed the resolution, and the passage of the resolution constituted an illegal attempt to interpret and apply the laws which the Council had previously enacted.

Maryland Reclamation appealed to the Court of Special Appeals with respect to the circuit court's declaration that Bills 91–10 and 91–16 were not invalid. The County did not cross-appeal from the circuit court's declaration that Resolution 15–91 was invalid. Before any further proceedings in the intermediate appellate court, this Court issued a writ of certiorari.

*MRA II*, 342 Md. at 480–86, 677 A.2d at 569–72 (footnote added). We held that MRA had not exhausted its administrative remedies, including appealing the Zoning Administrator's ruling to the Board of Appeals, and applying to the Zoning Administrator for variances. *Id.* at 496–97, 505–06, 677 A.2d at 577.

Thereafter MRA filed requests for interpretation with the Zoning Administrator, presenting nine issues. After receiving unfavorable rulings, MRA appealed to the Board of Appeals. The Board, through its Zoning Hearing Examiner, conducted

a hearing and issued a decision dated April 2, 2002 that the application of Bill 91–10 to the proposed rubble landfill did not violate federal, state, or local laws. As summarized by Judge Harrell in *MRA III*, the Hearing Examiner's findings and conclusions underlying this decision were as follows:

1. Bill 91–10 applies to MRA's property on Gravel Hill Road.

2. The requirements of Bill 91–10 can be validly applied to MRA's property on Gravel Hill road under the circumstances of this case and in light of the Environmental Article of the Maryland Code as well as other principles of Maryland law.

3. MRA's operation of a rubble landfill on its property at Gravel Hill Road pursuant to its state permit will violate applicable Harford County Zoning law, particularly Harford County Code §§ 267–40.1, 267–28C, 267–28D(4) and 267–41. Moreover, the Hearing Examiner questions whether the permit issued to MRA by MDE is validly issued as it was based on misinformation provided to the State by MRA regarding the conformance of the property and use with Harford County Zoning law.

4. MRA cannot obtain a grading permit unless it can meet the requirements of Harford County Zoning law. To the extent MRA does not meet specific standards it must seek a variance and obtain a variance from provisions with which it cannot comply. MRA's reliance on site plan approvals that pre-date the enactment of Bill 91–10 is without merit.

5. MRA's operation of a rubble landfill on its property at Gravel Hill Road pursuant to its State-issued Refuse Disposal Permit No. 91–12–35–10–D and as renewed by Refuse Disposal Permit 1996–WRF–0517 will violate applicable Harford County zoning law.

6. Harford County is not prohibited by the principles of estoppel from applying the provisions of Harford County Bill 91–10 (section 267–40.1 of the Harford County

Code) to MRA's property and specifically, to MRA's operation of a rubble landfill on its property.

7. MRA's rubble landfill did not acquire vested rights in its use that would insulate it from the application of Bill 91–10 to that use. It is the vested rights doctrine itself that allows a landowner to rais[e] issues of constitutional protections. There is no constitutional infringement on the rights of MRA because a vested right was not established. Applying the provisions of Bill 91–10 to MRA's Gravel Hill Road property is, therefore, not prohibited by the United State's Constitution and/or the Maryland Declaration of Rights.

8. Harford County is not preempted by the Environmental Article of the Maryland Code, particularly sections 9–201 et seq. and 9–501 et seq., from applying Bill 91–10 to MRA's Gravel Hill Road property.

9. MRA's operation of a rubble landfill on its Gravel Hill Road property is not a valid non-conforming use pursuant to Harford County Zoning Code.

*MRA III*, 382 Md. at 359–60, 855 A.2d at 357–58. After the issuance of the Hearing Examiner's decision, the following transpired:

On 11 June 2002, the County Council, sitting as the Board of Appeals, adopted the Zoning Hearing Examiner's decision. Harford County, therefore, refused to issue to MRA a grading permit or zoning certificate for the proposed rubble landfill because of the strictures of Bill 91–10. Neither in response to the Board of Appeals's final decision, nor on a parallel course to its requests for interpretation or a zoning certificate, did MRA seek variances for relief from the requirements of Bill 91–10.

On 21 June 2002, MRA ... petition[ed] the Circuit Court for Harford County for judicial review of the Board of Appeals's decision. The Circuit Court affirmed the decision of the Board of Appeals on 22 October 2003. It concluded that "all nine requests for interpretation were answered correctly ... in accordance with the law, and based on

substantial evidence, and the decision was also correct when it upheld the zoning administrator's denial of Maryland Reclamations request for a zoning certificate."

*MRA III,* 382 Md. at 360–61, 855 A.2d at 358. On appeal to this Court, we held that MRA again had failed to exhaust its available administrative remedies because it had not requested variances from the Code requirements at issue. *Id.* at 363, 855 A.2d at 359–60.

On May 12, 2005 MRA requested the following variances to provisions of the Harford County Zoning Code ("HCC") before the zoning hearing examiner for Harford County ("Hearing Examiner"):

- Variance pursuant to Section 267–28C to permit the disturbance of the 30 foot buffer yard.
- Variance pursuant to Section 267–28D(4) to permit disturbance within the 200 foot buffer from adjoining property lines.
- Variance to Section 267–40.1 A, B, C, and D to permit the operation of a rubble landfill on less than 100 acres.
- Variance to Section 267–40.1A, B, C and D to permit the operation of a landfill without satisfying the buffer requirement.
- Variance to Section 267–40.1 A, B, C, and D to permit the deposit of solid waste less than 500 feet from the flood plain district.
- Variance to Section 267–40.1 A, B, C, and D to permit the disturbance of the 1,000 foot buffer from a residential or institutional building.
- Variances to Section 267–41D(2)(c); (3)(b); (5)(e); and (6) to permit the use of a landfill within a Natural Resource District, to permit the disturbance of the Natural resources District buffer, and to disturb the minimum 75 foot wetlands buffer in the Agricultural District.

Over a span of 10 months, the Hearing Examiner, Robert F. Kahoe, Jr., presided over 17 nights of hearings, during which he heard testimony from 11 witnesses produced by MRA

(eight of whom were experts); six experts offered by the Protestants; 16 residents from the community and members of St. James parish; and the acting director of the Harford County Department of Planning and Zoning. The Hearing Examiner issued a decision dated February 28, 2007 that denied several of MRA's requests. His findings of fact and conclusions of law included the following:

[V]ARIANCES REQUIRING AN APPLICATION OF SECTION 267-11

The requested variances which require the application of the standard contained in Section 267-11, are discussed as follows.

*Variance to Permit Disturbance of 30 foot Buffer*

\* \* \*

[T]he Applicant also requests a variance to disturb the 30 foot buffer in certain locations along Gravel Hill Road. The County's and the opponents' position is that such a variance should be denied as the purpose of a buffer, and this buffer in particular, is to help protect adjoining properties from the impact of a proposed use.

The proposed rubble landfill has the potential of causing a great impact on the neighbors who reside on Gravel Hill Road, and on users of Gravel Hill Road.

\* \* \*

[T]he Applicant has made no good showing for a grant of the variance. Indeed, its witness Jacqueline Seneschal testified that the variance may not actually be necessary. The Applicant argues that the buffer can be disturbed by the rubble fill operation with the buffer then reinstalled after the fill operation is complete. If the Applicant suggests that a removal and reinstallation of a required buffer after the disturbance is complete is somehow allowed by Code, the Applicant is mistaken. A buffer is not only required to the final use, i.e., a capped and stable rubble-fill site, but is also required to the actual rubble-fill activity itself.

A fair reading of the Harford County Development Regulations, particularly Section 267-28, requires a buffer to be

maintained, improved or installed at the very beginning of the operation, and throughout the operation to final completion. [Footnote 2 omitted.] It may not be removed, and reinstalled, at the discretion of the Applicant. The 30 foot buffer must remain from the beginning of the operation, through completion and thereafter. No good reason has been suggested by the Applicant for modification of this variance requirement, except for the installation of an access road. No unique topographical characteristic of the site has been identified that would create a hardship or practical difficulty which would require relief by the granting of a variance. An adverse impact to neighbors would result if a reduction in the buffer were allowed. The Applicant's request for a variance to the 30 foot buffer yard requirement, except for its access road, is recommended to be denied.

*Variance to Allow Disturbance of the 200 foot Buffer*

The Applicant requests a variance to the requirements of Section 267–28D(4), that a 200 foot undisturbed buffer area be maintained between the fill area and adjoining properties. [This requirement is repeated at Section 267–40.1(B).].

It would appear that the Applicant proposes to disturb the 200 foot buffer area in most locations around the rubble-fill. The Applicant argues, however, that much of the 200 foot buffer has already been disturbed by prior mining activities and that the maintenance of the 200 foot buffer would;

> " . . . *have the effect of leaving a 200 foot trough with no noise or visual shields from the landfill activities.*"
> (See Applicant's Brief, page 16.)

* * *

The Applicant makes no argument that its property is somehow unique which causes a resulting hardship if the 200 foot buffer yard is required. Even if such an argument were made, however, it is herein found that the property has no unique characteristic or topographical condition which would create a hardship to the Applicant so as to

justify a relaxation of the 200 foot buffer yard requirement as requested by the Applicant.

* * *

The Applicant[,] ... primarily through its witness Jacqueline Seneschal, asserts that the topography of the site is unique compared to other properties in the neighborhood. This suggestion was refuted by Anthony McClune of the Harford County Department of Planning and Zoning. In truth, nothing distinguishes the subject property from other lands in the area except for disturbance due to past mining activity. While the extent of disturbance on the property may set it apart from other properties, this feature has nothing to do with an application of pertinent development standards. The suggested "uniqueness" of the property, to the extent it exists, does not cause a disproportionate impact of use restrictions and, accordingly, is not a cause of "practical difficulty" or "unreasonable hardship".

As a result of these findings it cannot be concluded that the existing 200 foot buffer would serve no purpose in helping to lessen the impact of the proposed use onto adjoining properties. Indeed, the opposite conclusion can readily be reached, which is that the disturbance of the 200 foot buffer during the rubble landfill operation would increase the disturbance to be seen and experienced by adjoining owners and residents. As a result, they would suffer an adverse impact.

The true hardship of the Applicant is that it would lose area within which to place its rubble-fill if the 200 foot buffer is required. The argument that a rebuilt buffer would be better for the neighbors is not a practical difficulty.... Simply being unable to do what one wants to do with [one's] property is not a hardship related to a underlying unique characteristic of the property or its topography.

* * *

Accordingly, it is recommended that the variance to the 200 foot buffer yard requirement be denied.

The Hearing Examiner also recommended denial of four other variances requested by MRA. These variances and the Examiner's response are as follows:

(1) *Variance to Allow Deposit of Solid Waste Within 500 feet of a Flood Plain District*

[EXAMINER:] MRA argues that the Flood plain buffer is not scientifically based, but is, in fact, a "political boundary." MRA suggests, through its witnesses, that a 350 foot to 400 foot Flood plain buffer would be as protective of the Flood plain as would a 500 foot buffer. In other words, a granting of this variance would make no difference to the Flood plain.

... [No] unique feature of the property or topographical condition is identified by the Applicant in support of this request. It merely states that the 500 foot setback request is not necessary.... [W]ithout a finding of uniqueness and resulting practical difficulty, the variance cannot be granted. Accordingly, it is recommended that the requested variance to the 500 foot buffer to the Flood Plain District be denied.

(2) *Variance to the 75 foot Historic District Buffer*

[EXAMINER:] There was much testimony concerning the historic significance of St. James AME Church not only to its congregants, but also to its larger neighborhood and to the history of the African American life within Harford County and the State of Maryland.

Testimony of Mr. Westmoreland was persuasive that the Church and its graveyard be preserved, that its significance to the African American community is pronounced. Being the final resting place of African American soldiers who fought in the Civil War is itself a factor sufficient to mandate that the Church and its graveyard be given all possible protections to help preserve their historical significance and the prominent place they continue to play in the history of our County and State.[3]

---

**3.** The Hearing Examiner acknowledged that only the graveyard, and not the Church building, is listed on the Harford County Inventory of

Harford County Development Regulations at Section 267–28E require that a use have a

".. *buffer and landscaping between 10 feet and 75 feet from any historic landmark as designated by the Historic Preservation commission[.]*"

The St. James AME Church graveyard is such [a] historic landmark. In determining the extent of this "buffer and landscaping", the Department of Planning and Zoning is to have the recommendation of the Historic Preservation Commission. The Department is to then require a buffer yard as determined by the Historic Preservation Commission, unless the Commission's decision is determined to be "arbitrary and capricious".... [N]o basis exists for requesting a variance to this process. In effect, the Applicant is requesting an interpretation of the application of the Code, not a variance. The proper procedure would be for the Applicant to appeal an interpretation of the Zoning Administrator once that interpretation is made.... [T]he requested variance to Section 267–28(E) cannot be granted.

(3) *Variance to the Code Requirement that the Rubble–Fill be Located on Not Less Than 100 Acres*

[EXAMINER:] MRA's parcel is 55 acres in size. Section 267–40.1(A) requires that the site be at least 100 acres. Obviously, the Applicant will not have a rubble-fill regardless of the finding on the other variances, unless it is granted a variance to the 100 acre requirement. The variance requested is substantial, with the Applicant suggesting that an area of just slightly more than one-half of the minimum acreage requirement is sufficient for approval.

Again, the Applicant's argument in favor of this argument is that;

---

Historic Sites. Notwithstanding this fact, he considered the Church to be important to its members and to the larger community.

*"Enlarging the site to 100 acres would serve no purpose and would be a practical difficulty."*

Again, no statutory or case authority exists which would justify the granting of a variance based on a perceived lack of need for the requirement for which the variance is requested. 80' rear yard setbacks may not, in property owners' opinions, be necessary, but they are nevertheless required in certain districts.... The decision on whether a property is 'unique' has literally nothing to do with a subjective perception of the need for the requirement for which a variance is sought.... "Need" is a concept related to adverse impact, not to unique characteristics or practical difficulty.

Furthermore, the Applicant cannot allege a disproportionate impact of the 100 acre requirement upon it. All properties of less than 100 acres in size are similarly impacted by the prohibition against rubble-fills on parcels of less than that size. The Applicant is treated no differently than any other similarly situated property owner.

Accordingly, it is recommended that the requested variance to the 100 acre minimum lot size requirement be denied.

(4) *Variance to Allow the Disturbance of the 1,000 foot Buffer for Residential or Institutional Building*

[EXAMINER:] Quite plainly, the Applicant cannot meet this requirement as the nearest residences, and St. James AME Church, are located on Gravel Hill Road, and well within the required buffer. The Applicant suggests, and its suggestion is accepted as correct, that the imposition of this buffer requirement would preclude its use of the site for a rubble fill.

\* \* \*

Again, without being unnecessarily redundant, the requirement that one conform [one's] use to the requirements of the Code is not a practical difficulty sufficient to justify the granting of a variance. MRA says, in effect,

that it cannot operate its rubble fill if it is required to conform with the 1,000 foot buffer. No other suggestion is made that the property is somehow otherwise unique, or has topographical conditions which cause a practical difficulty. Indeed, the difficulty arises from the application of the Development Regulations, not from any characteristic inherent to the property itself.

Furthermore, MRA suggests that if granted the variance the resulting impact would not be adverse to the surrounding neighbors as the rubble fill use would be similar to those uses allowed as of right in the agricultural district. While this argument has [a] patina of persuasiveness, such a suggestion is, at heart, simply incorrect. Certainly, some, perhaps all, of the equipment which will be operating on the MRA property is, at least occasionally, also used in agricultural operations.... However, those vehicles are not, generally, operated five ½ days a week, eight hours per day, as they are proposed to be used on the MRA property.... [T]he scope, intensity, duration and scale of the proposed use greatly exceeds almost any conceivable agricultural operation.

Accordingly, for the reasons set forth earlier in this opinion, it is found that a relaxation of the buffer, even if the Applicant can show a practical difficulty resulting in some unique feature of the property or its topography, would have an adverse impact which would be detrimental to the neighbors and their property.

Furthermore, a discussion of the Applicant's request to relax the 1,000 foot buffer requirement, as well as the other buffer requirements, cannot be concluded without note [being] made of the severe impact such relaxation would impose upon St. James AME Church and its congregation. For reasons clearly set forth in the testimony of Mr. Westmoreland, the St. James AME Church, and its graveyard, occupy a significant historical position in the Havre de Grace area and within Harford County and the State of Maryland in general. Mr. Westmoreland

was eloquent in his description of the Church and its place in our history and culture. . . .

\* \* \*

MRA has certain rights to use its property. However, it cannot use its property in derogation of the rights of other residents, and of adjoining institutions, to exist, thrive and continue to contribute to their community without unnecessary adverse impact. A relaxation of the 1,000 foot buffer, or for that matter a relaxation of any of the other non-NRD buffer requirements would cause harm to those residents and the institution of St. James AME Church.

It is accordingly recommended that the variance to the 1,000 foot buffer requirement be denied.

(Footnote added).

MRA appealed the Hearing Examiner's decision to the Board. On June 5, 2007, the Board voted 7–0 to deny the requested variances to these sections of the Code, and adopted the Hearing Examiner's decision. MRA then noted an appeal to the Circuit Court for Harford County. The Circuit Court affirmed the findings of the Board of Appeals in an order filed on July 11, 2008.

Because MRA had, at that point, sought and been denied variances, as required by our decision in *MRA III*, it renewed its 2003 appeal in the Circuit Court for Harford County. On September 3, 2008, the Circuit Court affirmed its October 2003 decision. MRA appealed its variance denials and the Circuit Court's affirmation of its previous decision, to the Court of Special Appeals ("CSA"). On our own initiative, we granted certiorari in both matters and shall address them both in this opinion. *See Maryland Reclamation Assocs. v. Harford County,* 406 Md. 744, 962 A.2d 370 (2008).

## I.

### Case No. 143 Issues

Regarding the denial of its request for variances, MRA presents the following questions on appeal, which we have rephrased and reordered:

1. Was there substantial evidence and/or did the Harford County Board of Appeals ("Board") correctly apply the applicable law in finding that granting the requested variances would be substantially detrimental to adjacent properties and/or the public safety and welfare?

2. Was there substantial evidence and/or did the Board correctly apply applicable law in finding MRA's property is not "unique" or subject to "topographical" conditions which make the application of certain setback and minimum lot size requirements to it a practical difficulty or unnecessary hardship?

3. Did the Board correctly apply the legal "practical difficulty" and/or "unreasonable hardship" variance standards set forth in the Harford County Zoning Ordinance when it refused to grant requested variances?

Harford County Zoning Code Section 267–11(A) provides that a variance may be granted if the Board finds that *both* of the following requirements are met:

(1) By reason of the uniqueness of the property or topographical conditions, the literal enforcement of this Part 1 would result in practical difficulty or unreasonable hardship.

(2) The variance will not be substantially detrimental to adjacent properties or will not materially impair the purpose of this Part 1 or the public interest.

In answer to the first question, we shall hold that the Board did not err in finding that the requested variances would be substantially detrimental to adjacent properties. Such a holding precludes the granting of the variances under HCC Section 267–11(A)(2). Because of this holding, we need not reach the second or third questions presented.

### Standard Of Review

We recently articulated the narrow standard of review we apply in zoning cases:

When we review the final decision of an administrative agency, such as the Board of Appeals, we look through the circuit court's and intermediate appellate court's decisions,

although applying the same standards of review, and evaluate[ ] the decision of the agency. Judicial review of administrative agency action is narrow. The court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency[.] In our review, we inquire whether the zoning body's determination was supported by such evidence as a reasonable mind might accept as adequate to support a conclusion[.] As we have frequently indicated, the order of an administrative agency, such as a county zoning board, must be upheld on review if it is not premised upon an error of law and if the agency's conclusions reasonably may be based upon the facts proven.

*People's Counsel for Balt. County v. Loyola College in Md.,* 406 Md. 54, 66–67, 956 A.2d 166, 173–74 (2008) (citations and quotations omitted).

■ As we stated in *Lanzaron v. Anne Arundel County,* 402 Md. 140, 147, 935 A.2d 689, 693 (2007), in reviewing challenges to zoning variance decisions, "[a] court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." (Citation and quotations omitted).

### Detrimental Effect Of Rubble Landfill On Adjacent Properties

The Board's denial of MRA's requested variances shall be upheld if the proposed rubble landfill will be "substantially detrimental" to adjacent properties. *See* HCC § 267–11(A)(2). We conclude that the Board did not err in denying the requested variances because there was sufficient evidence that MRA's proposed rubble landfill will "adversely affect the public health, safety, and general welfare," will "jeopardize the lives or property of people living" and result "dangerous traffic conditions" in the Gravel Hill and St. James communities.

*The Proposed Rubble Landfill Will Adversely Affect*
*St. James And Its Historic Graveyard*

Testimony presented during the hearing established that St. James is a vibrant, active 103–member congregation. Reverend Violet Hopkins–Tann has served as pastor of the St. James church for 23 years and provided testimony about the events and activities that take place at the church. These activities included Bible study, cooking and baking, choir rehearsals, board meetings, weddings and funerals, and took place both during the week and on weekends. Although MRA proposed an arrangement in which truck activity would not take place during funerals, no such concession was made with regard to rubble landfill operation during other church activities.

MRA's property surrounds St. James's property and according to the joint stipulation of facts, "[t]he outer boundary of 'the property' lies within 25 feet from St. James[.]" Edward Serp, an environmental engineer, testified on behalf of MRA that the following equipment would be used at the rubble landfill between the hours of 7:00 A.M. and 5:00 p.m.: bulldozers, front end loaders, water trucks, power broom sweeper, self-loading earth moving pans, hydroseeder, and mulcher. Serp also testified that there would be noise from the "back-up alarms" that results from the use of these machines. It is easy to envision how this kind of machinery could obstreperously interfere with church activities occurring at St. James.

A major point of discussion during the course of the hearings was the historical significance of the church, which would be adversely impacted if MRA is permitted to operate a rubble landfill on its Property. Appellees provided Carl Westmoreland, an expert in the preservation of historic African–American sites, to discuss this topic. When asked about the effect the rubble landfill would have on the historic preservation of the St. James site, Westmoreland testified that:

The imposition or the activation of a dump site would create an industrial environment that would be in conflict with the

18th and 19th century environment that predominates at this point and would compromise the historical integrity and the cultural legitimacy of this community that has existed for over 150 years and that has attempted to function within the mores and the cultural traditions of Maryland.

To me, when you arrive there, if you didn't know that it was a black church, it's just a little modest church. When you see the Civil War monuments, the only reason you know they're black is because it says USCT, but it's typical of what you would see in the Maryland landscape. And I think that's what people in Havre de Grace and in Gravel Hill have struggled for, to become a part of the American mainstream and this documents their efforts. . . .

MRA does not challenge the specific proposition that the rubble fill activities will interfere with church activities or diminish the historical ambiance of the church. Instead, MRA attempts to discredit Westmoreland's testimony. They argue:

[Westmoreland claimed] that MRA's property should remain undeveloped because he concluded a landfill would create an "industrial" environment, but later contradicted himself stating the one closed rubble landfill he had seen was a golf course. (Mr. Westmoreland was the only expert witness introduced by Protestants whose testimony was discussed in the "Findings of Fact" portion of the Board's opinion denying variances.) Reliance upon Mr. Westmoreland's generalized conclusions of adverse impact, which were clearly not based upon any review of the technical record presented by MRA in the case, or any applicable regulatory standards, was erroneous as a matter of law.

This argument reflects a fundamental misunderstanding of Westmoreland's testimony, which was not at all technical in nature. Rather, Westmoreland offered perspective on the general atmosphere at St. James and the impact that rubble landfill activity would have on it. We are not convinced that Westmoreland's lack of technical expertise diminishes the value of his opinion.

Appellees also presented the testimony of an expert archaeologist, Dr. James Gibb, as further evidence of the fact that operating a rubble landfill on the Property will adversely affect the Church. Gibb holds a doctorate in anthropology, has been an instructor in anthropology and archaeology, and specializes in surveying properties for archaeological sites and collecting data that can be used to identify historical significance. Gibb testified that the Church is historically significant, a "central institution" that the African–American community built. Appellees specifically rely on Gibb's testimony that the Church represents "the history of that community," and his opinion that operating a rubble landfill in the immediate vicinity will adversely affect the Church both atmospherically and physically. MRA challenges Gibb's testimony because in forming his opinion, he said he did not conduct the level of research for this case that he would have were he operating under a "normal contract." When we examine the nature of Gibb's testimony, it becomes clear that the level of research he did do—reviewing tax records, examining the original deeds available from the Maryland State Archives, and the work of a local historian—is commensurate with the portion of his opinion on which the Appellees rely: the church's historic atmosphere.

■ Gibb's testimony regarding the impact of MRA's proposed rubble landfill on the historic graveyard that surrounds the Church was also challenged by MRA. The graveyard is designated as a Harford County historic place because buried therein are the remains of soldiers who served in the United States Colored Infantry during the Civil War. MRA and the Appellees disagree about whether the rubble landfill will adversely impact the graves, which resulted in a credibility contest between their experts. Gibb testified that dust will be permitted to blow onto the cemetery, which will destroy the historic setting of the cemetery. Gibb also testified that the slopes around the existing graves are stabilized with vegetation and that destabilizing the vegetation could be detrimental to the graves. MRA argues that Gibb's opinion is not sufficiently supported by a technical analysis.

MRA's archeological expert, Michael Clem, opined that the proposed rubble fill would not adversely affect the historic cemetery located on the Church property and that "the graves will actually be better protected from erosional forces by filling." Appellees point out that Clem has not yet obtained his Ph.D. and works for the same company as all of MRA's other experts. The Appellees contend that "Mr. Clem's opinion is not only completely unfounded, it was undermined by Dr. Gibb, who has substantial experience excavating cemeteries." Appellees also point out that Mr. Clem admitted that he could not testify to the impact that the operation of the rubble landfill may have on the graves during its operation.

In *Dundalk Holding Company, Inc. v. Horn*, 266 Md. 280, 292, 292 A.2d 77, 83 (1972), we held that when there are differing opinions of two well-qualified experts and a zoning issue is fairly debatable, then the County Board could "quite properly" accept the opinion of one expert and not the other. We further held that "[c]ourts, under these circumstances, should not substitute their judgment on a fairly debatable issue for that of the administrative body." *Id.* The Board was in the best position to evaluate the credible position of these two experts and it was within its bailiwick to give greater weight to the appellee's expert's opinion.

MRA challenges the substance of Appellee's expert and cites *Anderson v. Sawyer*, 23 Md.App. 612, 626, 329 A.2d 716, 725 (1974), in which the CSA reversed a Board decision that hinged on expert testimony. In *Anderson*, opponents to a proposed funeral home seeking special exception for construction of a funeral home on land zoned for residential use. The opponents presented testimony indicating concerns with traffic congestion and safety as well as that the proposed use would have detrimental psychological effects due to the morbid nature of the undertaking business. *Id.* at 616, 329 A.2d at 719. The CSA reversed the Board's denial of the exception because the traffic engineer's testimony was unsupported by facts and the real estate expert's opinion regarding psychological effects was insufficient to overcome the presumption that the special exception would promote the general welfare. *Id.*

at 622–25, 329 A.2d at 723–24. The CSA concluded that "[t]he record is so devoid of substantial supporting facts as to be incapable of raising a debatable issue." *Id.* at 625, 329 A.2d at 725.

We do not see Gibb's testimony as "devoid of substantial supporting facts." He discussed the detrimental environmental effects that would result from construction and operating the rubble fill:

> ... I think if we look at aerial photographs, we'll find a good part of that area has always been forested with clearings for house and gardens and such, small fields for maize and tobacco.
>
> So in order to use that quarry again, it will have to be deforested. **You have to remove the trees before you can get the trucks in; and that's just logical. And that will be fairly extensive deforestation.**
>
> So that will affect the setting. And as far as physical effects on the site, we've got dust, which is unavoidable in cases where any kind of clearing goes on. And I presume ... that problem will be exacerbated with trucks moving large quantities of rubble.
>
> So dust is going to affect the fabric of the building, the church. It may effect the gravestones too. I haven't really looked at it in those terms, **but the dust will affect the building. Dust gets into all the cracks and crevices. We've had a temperate winter, but sooner or later we're going to have a cold, wet winter. That dust, once it gets into the crevices, will absorb water. It will expand and contract and cause deterioration of the building.**
>
> An area that is difficult to ascertain at this point is going to be the effects of vibrations. We don't know what effects vibrations in the original quarry had on the building, but it may have been partly responsible for some of the damage done to building[.] [Emphasis added.]

Gibb also refuted Clem's testimony, which gave the hearing examiner sufficient grounds to favor his testimony rather than Clem's:

[Appellee Counsel]: Dr. Gibb, have you read the testimony of MRA's expert archaeologist, Mr. Michael Clem, who testified before this body on June 1st?

[Gibb]: I have.

[Appellee Counsel]: In his testimony Mr. Clem stated that the cemetery would, quote, be positively impacted by a better view shed and the graves would be better protected from erosional forces by filling if the proposed rubble landfill was allowed to proceed.... Do you agree with that statement?

[Gibb]: In the present condition of the land, I would say no because you would have to clear those slopes before you can fill them. Right now the slopes down from the cemetery, the quarry face, have stabilized. They've revegetated. There must be 30, 40 years of growth there at least.

In sum, we conclude that there is sufficient evidence in the record to support the Board's finding that the rubble landfill activities will be "substantially detrimental" to the St. James church and graveyard.

*Health and Welfare of People in*
*the Gravel Hill Community*

■ Appellees averred in the proceedings before the Board that the rubble landfill would adversely affect the property of individuals who reside in the surrounding area. Harford County points to the testimony of Dr. Patrick Breysse, who was accepted as an expert in the field of environmental health science. According to Dr. Breysse, the diesel fumes that will be emitted by trucks that will traverse Gravel Hill Road to access the rubble fill could cause a three to seven-fold increase in air pollution and particulate matter, based on comparable data. Appellees contend that "[t]his increase in air pollution is likely to result [in] worsening of asthma in children ... and cardio-respiratory difficulties in susceptible elderly persons...."

■ MRA counters that Dr. Breysse stated that he performed no empirical studies in MRA's vicinity, had not attend-

ed any of the hearings, and was not familiar with the Maryland Department of the Environment's ("MDE") statutory scheme regarding the regulation of air quality nor with MDE's permitting requirements for rubble landfills. In a manner reminiscent of its challenge to Westmoreland's testimony, MRA has attacked Breysse's unfamiliarity with legal components of this case rather than the substance of his contention about air quality. Although knowledge of these legal matters and standards may have enhanced his testimony, it was not critical, and its absence did not vitiate the admissibility of his testimony about the increase in air pollution, which was apparently found credible by the Hearing Examiner.

Furthermore, Serp testified that in order to install a liner and construct a rubble landfill on the property the existing forest on the Property would have to be removed. According to Bryan McKay, who was accepted as an expert in biological sciences, the removal of the forest will have a variety of adverse impacts on the properties surrounding MRA's Property: the temperature of the soils will rise due to the elimination of the tree shade; erosion will increase because existing trees and other vegetation that provide shade will be eliminated; and the amount of sediment runoff will increase. Mr. McKay also testified that the removal of the existing vegetation from the Property would reduce the diversity of plant life in the surrounding area, which, in turn, would result in a decrease in the diversity of animal species. MRA challenges this testimony because McKay's conclusions "applied to all development generally, and not to this rubble landfill in particular." This is not accurate. The witness specifically tied his opinion to the Property:

> [Appellee Counsel]: So if the forest on MRA's property was deforested, there would be a reduction in animal and plant species along Gravel Hill Road as well; is that right?
>
> [McKay]: Yes.

Serp testified—for MRA—that the rubble landfill would operate for approximately five years, and then a "cap" would be installed over the fill that would take approximately three

years to construct. MRA testified that it intended to replant trees on top of the "cap;" Appellee expert Professor Stan Kollar, an expert in forest conservation, presented testimony arguing against that possibility. Kollar explained that the depth of the soil that will be placed over the "cap" could be insufficient to allow the regrowth of a forest. Professor Kollar testified that the methane that will inevitably be produced by the fill would typically move upwards and compromise the roots of the trees and shrubs that are planted on top of the "cap" and in surrounding areas. The Hearing Examiner was in the best position to evaluate this conflicting testimony. The evidence of decreased vegetation and increased diesel fumes is sufficient to support a finding that the rubble landfill would negatively affect the health and welfare of the individuals in the surrounding area.

Appellees also proffered testimony from fourteen individuals who live or attend church in the area of Gravel Hill Road. Appellees characterize this testimony as follows: "[t]he individuals who testified explained how permitting a rubble landfill to operate in their community will interfere with the enjoyment of their homes and yards through the introduction of increased traffic, noise, dust, vermin, and the general unpleasantness of having a landfill in close proximity to their homes." We have reviewed this testimony and find Appellees' characterization accurate.

### Traffic Conditions along Gravel Hill Road

■ According to the parties' stipulation of facts, "MRA anticipates that approximately 50 trucks per day will enter Gravel Hill Road." Appellees contend that "[t]his is virtually a 50–fold increase from the non-existent [traffic] that presently exists on the road." MRA presented a traffic expert, Jeffrey Lawrence, who testified that the increased truck traffic on Gravel Hill would only add a 12.5 second increase to time spent at the traffic intersection and would not jeopardize the safety of the community. Appellees point out that Lawrence did not know how many children lived along the road, did not know where and how many times school buses stopped along

the road, and testified that in reaching his conclusion with regard to traffic, he did not take into consideration any activities that take place at the Alfred B. Hilton Park or St. James Church and graveyard.

Indeed, it is the school bus issue—rather than the sheer number of vehicles passing through—that formed a key component of the hearing. Resident George Herb Jonas testified that four different school buses stop along Gravel Hill Road in both the morning and the afternoon. This means that children are required to cross Gravel Hill Road at least once a day to access their homes. Appellees point out that several parents and grand-parents testified that they fear for the safety of their children crossing the street in light of the 50 additional trucks crossing their road. Parents of children who frequently walk or bike along Gravel Hill Road also expressed concern about their children's safety in light the increased truck traffic.

MRA did not address these concerns about child safety and there was sufficient evidence to support the Board's findings and conclusion in favor of the Appellees.

### Conclusion

In sum, the Board rested its decision to deny all of these requested variances because they did not meet the second requirement of HCC Section 267–11(A)(2) that each "variance will not be substantially detrimental to adjacent properties...." We conclude that there was sufficient evidence, with respect to each requested variance, to support the Board's conclusion. Accordingly, we hold that there was no error by the Board, the Circuit Court, or the CSA in affirming the Board's conclusions in this regard. With this holding, we have addressed all of the questions presented in Case No. 143, and the next sections will address the issues in Case No. 144.

### II.

### Case No. 144 Issues

In Case No. 144 MRA advances several legal theories as to why Harford County cannot apply certain zoning laws to the

Property under these circumstances. MRA presents the following questions:

1. Is Harford County preempted by State law, including the comprehensive regulatory scheme set forth in the Environmental Article of the Maryland Annotated Code and regulations adopted in support thereof, from applying newly enacted zoning regulation Bill 91–10 to MRA's property on Gravel Hill Road when Bill 91–10 was enacted and purportedly applied to MRA's property after Harford County zoning and Solid Waste Management Plan approvals had been given to MRA's rubble landfill application during Phase I of the State rubble landfill permit application process?

2. Is Harford County precluded by the United States Constitution, the Maryland Declaration of Rights and 42 U.S.C. § 1983 from applying County zoning regulations enacted or revised after MDE began processing Phase II of MRA's rubble landfill permit application to MRA's proposed rubble landfill on its property since MRA had a vested right in its prior County zoning approval to proceed with Phases II and III of the MDE's rubble landfill permitting process?

3. Is Harford County estopped from arbitrarily and unreasonably applying the provisions of Harford County Bill 91–10 (or other revised County regulations) to MRA's proposed operation of a rubble landfill on its property pursuant to its State-issued permit when MRA purchased its property in justifiable reliance on Harford County's zoning and Solid Waste Management Plan approvals during Phase I of the State's rubble landfill permitting process?

4. Will MRA's operation of a rubble landfill on its property at Gravel Hill Road pursuant to lawfully State-issued Refuse Disposal Permits violate applicable Harford County zoning when Harford County granted zoning and Solid Waste Management Plan approval to MRA's proposed rubble landfill during Phase I of the State rubble landfill permit application process?

5. Will MRA's operation of a rubble landfill on its property pursuant to its State-issued permit constitute a valid non-

conforming use pursuant to § 267–18 of the Harford County Zoning Code?

6. Did Harford County improperly fail to issue MRA's grading permit due to the passage and application of Bill 91–10 to MRA's property, which grading permit issuance is a condition of MRA's Solid Waste Management Plan approval, even though all applicable County review agencies, including zoning, approved the grading permit application before the enactment of Bill 91–10?

7. Did the Hearing Examiner properly raise, sua sponte, and rule that MRA is not entitled to rely upon its 1989 County Site Plan approval which pre-dated the enactment of Bill 91–10 given that this issue was not raised by MRA in a Request for Interpretation and was not ruled upon or mentioned by the Zoning Administrator?

We address these questions in turn.

### 1. Preemption

 MRA argues that "[t]he State's comprehensive scheme for regulating the permitting of rubble landfills in Maryland nullifies Harford County's extensive efforts to stop MRA's rubble landfill by doing a zoning 'end-run' around the State regulatory process." "Under Maryland law, State law may preempt local law in one of three ways: (1) preemption by conflict, (2) express preemption, or (3) implied preemption." *Worton Creek Marina, LLC v. Claggett,* 381 Md. 499, 512, 850 A.2d 1169, 1176 (2004) (citation and quotations omitted). MRA's argument rests on express and implied preemption. Preemption by implication occurs when "local law [d]eals with an area in which the [State] Legislature has acted with such force that an intent by the State to occupy the entire field must be implied[.]" *Talbot County v. Skipper,* 329 Md. 481, 488, 620 A.2d 880, 883 (1993) (citations and quotations omitted). "Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute." *Claggett,* 381 Md. at 512 n. 6, 850 A.2d at 1176 n. 6.

■ MRA argues that preemption exists here because 91–10 allows Harford County to "veto the State's permit process ... contrary to the State's pervasive regulatory permitting scheme for rubble landfill permits." The Board of Appeals rejected the preemption argument below, writing that "MDE has not preempted the application of zoning laws to rubble landfills and indeed, as part of the specific requirements to obtain a permit to operate a rubble landfill, an Applicant is required to attest to compliance with local zoning laws."

Upon careful examination of MRA's argument, we see that this supposed "conflict" between County law and MDE permitting that MRA perceives does not consist of any overlap in regulatory "fields." Rather, we believe that MRA's argument conflates zoning with permitting. We explain.

### *Zoning Versus Permitting*

MRA argues that "the application of Bill 91–10 to MRA's pending State permit application after County zoning approval had been granted ... veto[ed] the entire State permitting process regarding MRA's pending application[.]" MRA cites the Express Powers Act, Maryland Code (1957, 2005 Repl. Vol.), Article 25A ("Express Powers Act"), Section 5(T), which allows the County:

> To enact local laws enabling the county council to adopt from time to time, after reasonable notice and opportunity for public hearing and with or without modifications, ordinances and amendments thereof for the protection and promotion of public safety, health, morals, comfort and welfare, relating to any of the following: the location, construction, repair, and use of streets and highways; the disposal of wastes; the control of problems of soil erosion and of the preservation of the natural topography in newly developed and other areas; and the erection, construction, repair and use of buildings and other structures; and to enact local laws providing appropriate administrative and judicial proceedings, remedies, and sanctions for the administration and enforcement of such ordinances and amendments.

MRA also cites the Express Powers Act Section 5(X)(2)(v), which provides:

The powers granted to the county pursuant to this paragraph shall not be construed:

1. To grant to the county powers in any substantive area not otherwise granted to the county by other public general or public local law;

2. To restrict the county from exercising any power granted to the county by other public general or public local law or otherwise;

3. To authorize the county or its officers to engage in any activity which is beyond their power under other public general law, public local law, or otherwise; or

4. To preempt or supersede the regulatory authority of any State department or agency under any public general law.

MRA reasons that because Section 9–210 of the Environmental Article gives the State government authority to issue permits for rubble landfills, the County is preempted from enacting zoning ordinances that would preclude operation under such a permit, if the applicant had passed any phase of the State's multi-phase permitting process. This argument ignores Sections 5(X)(2)(i) and (ii) of the Express Powers Act which provide:

(2)(i) It has been and shall continue to be the policy of this State that the orderly development and use of land and structures requires comprehensive regulation through implementation of planning and zoning controls.

(ii) It has been and shall continue to be the policy of this State that planning and zoning controls shall be implemented by local government.

The Express Powers Act clearly contemplates zoning as an activity that exists in a sphere separate from the operations of State level regulation. *See, e.g.,* 4–55 *Antieau on Local Government Law* § 55.11 (2d Ed. 2009) ("local planning and zoning regulations may be imposed in conjunction with region-

al planning activities where there is no conflict between the two").

MRA cites the CSA's opinion in *MRA I* in arguing that Harford County's actions here amount to a de facto veto of MDE's permitting process, thus allowing local government to impermissibly control a state regulatory scheme. In *MRA I*, the CSA held that "[t]he important governmental function of providing responsible solid waste management cannot be abandoned to the vicissitudes of the local political scene by an over-broad interpretation of what constitutes a regulatory field." 90 Md.App. at 157, 600 A.2d at 882. MRA overlooks the previous paragraph in the opinion, where the CSA held that

> the state legislature may take a broad category ... and legislatively preempt a segment or portion of that category, **leaving other portions open for local control**.... Likewise, the Maryland statutes governing solid waste management divide the regulatory scheme into segments pertaining to issuing permits and to planning, and **whereas the planning segment assigns to counties a distinct, albeit statesupervised role, the permit-issuing segment reserves power to the state's agency, MDE.**

*Id.* at 156–57, 600 A.2d at 881–82 (emphasis added). The CSA held that the County could not revoke its inclusion of the Property in SWMP as a step in the State permitting process, but made no ruling about the county's authority to modify its zoning law. The CSA delineated the role that local authorities play with regard to landfills:

> In summary, we hold that the legislature intended to occupy the field of landfill regulation in a manner that limits a county's role to identifying the type of waste that may be disposed of in a rubble landfill, determining whether a proposed site is consistent with its SWM plan, **and in determining whether a site meets "all applicable zoning and land use requirements."**

*Id.* at 157, 600 A.2d at 882 (emphasis added). The CSA concluded that when

the Harford County Council enacted Resolution 4–90, it obviously did so because of a feared threat to ground water resources in the area and because of considerations related to land use compatibility. It was not a determination that the site was inconsistent with the Harford County solid waste management plan. Under the statutory scheme, as it exists between the state and Harford County, the **"specific determination concerning the hydrogeological conditions of the site and the area" was an impermissible invasion on the state's permit review prerogative.**

*Id.* (emphasis added). When the County Council enacted Bill 91–10, it did not do so based on hydrogeological conditions of the site or other criteria falling within the bailiwick of MDE. It did so for classic zoning considerations: the impact of the use on neighboring properties due to emissions from the site, increase in noise, increase in traffic, danger to children, impairment of landscape and visual concerns, etc.

There is no doubt that an MDE permit is mandatory for operation of any waste disposal system in this state. *See* Md.Code (1982, 2007 Repl.Vol., 2008 Cum.Supp.), § 9–204(d) of the Environment Article ("A person shall have a permit issued by the [MDE] Secretary under this section before the person installs . . . [a] refuse disposal system."). It is equally plain that local zoning requirements are a check on the permitting process. Environment Article Section 9–210(a)(3)(i) states that "the [MDE] Secretary may not issue a permit to install" a waste disposal system unless that system "[m]eets all applicable county zoning and land use requirements. . . ." Taken together, these provisions indicate a clear intent on the part of the General Assembly to locate environmental permitting with the MDE, and zoning with local government. There is no reasonable way to construe these provisions of the Maryland Code as doing anything other than complementing local government's role in planning and zoning. If we held otherwise, we would be reading an over-broad preemptive intent into an otherwise clear statutory scheme. MRA's preemption argument fails because it does not account for the dual nature of this process. *See Ad + Soil, Inc. v.*

*County Comm'rs of Queen Anne's County,* 307 Md. 307, 513 A.2d 893 (1986) (holding that "the relevant body of state law [did] indeed regulate many aspects of sewage sludge utilization" but was not "so comprehensive that the acceptance of the doctrine of pre-emption by occupation is compelled.").

*Preemption Based on Legislative Changes*
*to The Environment Article*

MRA further argues that: "[t]he State's 1988 amendment to [Section 9–210 of the Environment Article] repealed the County veto authority over rubble landfill approvals." Environment Article Section 9–210 was amended by Chapter 412 of the Acts of 1988, which required the permit applicant, rather than the county council, to submit a written statement to the MDE confirming that the proposed refuse disposal system conformed to local zoning and land use requirements. Before the 1988 amendment, the statute charged the County Council with this duty. Section 9–210 read:

### Same—Prerequisites for issuance of a permit.

The Secretary may not issue a permit to install, materially alter, or materially extend a landfill until:

(1) The landfill meets all zoning and land use requirements of the county where the landfill is or is to be located; and

(2) The Department has a written statement that the board of county commissioners or the county council of the county where the landfill is to be located does not oppose the issuance of the permit.

The 1988 amendment made 91–10 read as follows:

The Secretary may not issue a permit to install, materially alter, or materially extend a refuse disposal system regulated under § 9–204(a) of this subtitle until the Department has a written statement **from the applicant** that the refuse disposal system conforms to the county solid waste management plan **and meets all applicable zoning and land use requirements.**

(Emphasis added.) MRA looks to *MRA I*, 90 Md.App. at 153, 600 A.2d at 880, for support, focusing on the CSA's statement that the 1988 amendment "reflects the legislature's intent to remove any suggestion that a county exerts control in the process of **issuing landfill permits.**" (Emphasis added) This comment does not advance MRA's cause because the control that the County imposed here relates to zoning, not permitting. But it has always been clear that the State recognizes that the county zoning laws may limit a property owner's ability to utilize any permit issued by DOE.[4]

---

**4.** Section 9–210 was modified again by House Bill 192 Chapter 516 of the Acts of 1992, which *removed* the language requiring a written statement from the applicant. The provision then read—in addition to a separate rubble landfill section added by Chapter 358 of the laws of 1989:

(a) *In general.*—The Secretary may not issue a permit to install, materially alter, or materially extend a refuse disposal system regulated under § 9–204(a) of this subtitle until the requirements set forth in this subsection are met in the following sequence:

(1) Except for the opportunity for a public informational meeting, the Department has completed its preliminary phase 1 technical review of the proposed refuse disposal system;

(2) The Department has reported the findings of its preliminary phase 1 technical review, in writing, to the county's chief elected official and planning commission of the county where the proposed refuse disposal system is to be located; and

(3) **The county has completed its review of the proposed refuse disposal system, and has provided to the Department a written statement that the refuse disposal system:**

(i) **Meets all applicable county zoning and land use requirements; and**

(ii) Is in conformity with the county solid waste plan.

(b) *Rubble landfills.*—(1) The Secretary may not issue a permit for a rubble landfill under § 9–204(a) of this subtitle unless the county in which the rubble landfill is located has specified the types of waste that may be disposed of in that rubble landfill in its county solid waste management plan under Subtitle 5 of this title.

(2) The types of waste that a county may allow to be disposed of in a rubble landfill under this section include:

(i) Trees;

(ii) Land clearing debris that is not a controlled hazardous substance as defined in Title 7, Subtitle 2 of this article;

(iii) Demolition debris that is not a controlled hazardous substance as defined in Title 7, Subtitle 2 of this article; and

(iv) Construction debris that is not a controlled hazardous substance as defined in Title 7, Subtitle 2 of this article.

MRA also looks to the 1998 amendment to the statute added by Chapter 532 of the Maryland laws, which added, *inter alia*, a new subsection (b), which reads: "Upon completion of the requirements of subsection (a)(1) and (2) of this section, the Department shall cease processing the permit application until the requirements of subsection (a)(3) of this section are met." MRA argues:

The County's role in the context of Md.Code Ann., Envir. § 9–210 (including granting or denying zoning approval) must have a beginning and an end. As clarified by State law, the County's role ends after it provides the MDE with a written statement that the refuse disposal system meets all County and land use requirements and is in conformity with the County solid waste plan. This was also Harford County's expressly stated policy manifested by its consideration of MRA's SWMP and Site Plan application during Phase I of the MDE permit review process. **While of course the County is permitted to subsequently amend its zoning code within constitutional bounds, it may not *apply* its amendments to a rubble landfill application**

(3) The following types of waste may be disposed of in a rubble landfill subject to the regulations adopted under this subtitle if the disposal of these wastes is expressly approved by the county in its county solid waste management plan:

 (i) Asbestos, if:

 1. The asbestos is wet or otherwise in accordance with federal national emission standards for hazardous air pollution when delivered to the landfill; and

 2. The owner or operator of the landfill retains a record that clearly delineates where the asbestos has been deposited;

 (ii) White goods; and

 (iii) Subject to § 9–228(f) of this subtitle, scrap tires.

(Emphasis added).

The legislative history for House Bill 192 contained the following "Bill Rationale":

 Currently, the Department must process a permit for a refuse disposal system when it receives a statement from the applicant that the proposal meets zoning requirements and is consistent with the county solid waste plan. **This has led to problems where the applicant and the county disagree, or where the applicant believes a conditional use should be available, but hasn't yet actually filed for it.**

(Emphasis added.)

pending before the MDE in Phases II or III with the effect of interfering with the MDE's process of issuing a landfill permit or causing the MDE to issue "lifeless" permits (i.e., permits which cannot be used because of retraction of zoning approvals).

(Citations omitted and emphasis added.) This argument again conflates zoning and permitting by failing to recognize that they perform different functions and can occur in tandem and with different results. Success in each arena is necessary to operate the rubble landfill; neither alone is sufficient. Because MRA is dissatisfied with the zoning result in this case, it attempts to impose time limits on legislative changes to the zoning code that simply do not exist.

Contrary to MRA's assertion, its argument is not supported by the CSA's decision in *Mayor and City Council of Baltimore v. The New Pulaski Company Limited Partnership*, 112 Md.App. 218, 684 A.2d 888 (1996). In *New Pulaski*, the City of Baltimore imposed a moratorium banning the construction or expansion of incinerators in the City for five years and the CSA found that this ban intruded "on the State's power to regulate and issue permits in the area of solid waste management[.]" *Id.* at 233, 684 A.2d at 894. MRA asks this Court to view the ban in *New Pulaski* in a similar light to the zoning regulation at issue here. But the regulation at issue here is less restrictive than a categorical ban and thus, *New Pulaski's* reasoning does not apply.

In sum, the County's right to enact and enforce zoning regulations is not preempted by the state statute governing landfills.

### 2. *Constitutional Issues*

#### *Vested Rights*

This Court has set forth a clear standard for determining when a person has obtained a vested right in an existing zoning use:

Generally, in order to obtain a vested right in an existing zoning use that will be protected against a subsequent

change in a zoning ordinance prohibiting that use, the owner must initially obtain a valid permit. Additionally, in reliance upon the valid permit, the owner must make a substantial beginning in construction and in committing the land to the permitted use before the change in the zoning ordinance has occurred.

*Powell v. Calvert County*, 368 Md. 400, 411–12, 795 A.2d 96, 102–03 (2002) (quoting *O'Donnell v. Bassler*, 289 Md. 501, 508, 425 A.2d 1003, 1007 (1981)). The Hearing Examiner, applying this rule, and other settled Maryland law, concluded that no vested right had attached.

Yet MRA asserts that its efforts thus far constitute a vested right because MRA:

made a substantial change of position in relation to the land (i.e., it purchased the land after it received zoning and Solid Waste Management Plan approval); it made substantial expenditures (it spent over a million dollars in land acquisition, engineering and legal fees); and it incurred substantial obligations (it proceeded with the engineering development plans for Phases II and III of the State's permitting process). . . .

The Examiner rejected MRA's contention that its previous expenditures should amount to a vested right, pointing to clear Maryland precedent on the issue. *See, e.g., Ross v. Montgomery County*, 252 Md. 497, 506–07, 250 A.2d 635, 640 (1969) (holding that expenditures on architectural planning do not create vested right); *County Council for Montgomery County v. District Land Corp.*, 274 Md. 691, 707, 337 A.2d 712, 721 (1975) (holding that one million dollars in expenditures and a valid building permit did not create vested right in previous zoning classification of the land at issue).

 MRA attempts to carve out a new category of use that will grant it "a vested right in a County zoning approval in the context of a State-controlled permitting process." [5] As

---

5. MRA did not take any steps that would actually put individuals on notice of MRA's use of the land and its claim that the right to proceed

the Appellees put it, MRA seeks "a vested right in zoning approval." We follow many decades of Maryland law in holding that MRA needs more than a state permit and site plan approval in order to have a vested right.

We are not persuaded otherwise by MRA's argument that this case parallels *National Waste Managers, Inc. v. Anne Arundel County*, 135 Md.App. 585, 763 A.2d 264 (2000), *cert. denied*, 363 Md. 659, 770 A.2d 167 (2001). In *National Waste*, the Court considered a rubble landfill project in Anne Arundel County. *Id.* at 587, 763 A.2d at 265. The developer had obtained a necessary special exception or variance from the County which it needed to receive a permit from MDE. *Id.* at 590, 763 A.2d at 267. But after National Waste had received the special exception, Anne Arundel County employed a number of tactics to delay the permit being issued, including court challenges and mis-communication with MDE. *Id.* at 590–92, 763 A.2d at 267–68. After multiple judgments against the County (and a contempt order against the County), the County attempted to argue that the special exception, which required action within two years, had expired. *Id.* at 598, 763 A.2d at 271.

The CSA focused on National Waste's contention that the time period set forth in the county code was tolled by the entire course and duration of the litigation, as well as the County's conduct. *Nat'l Waste*, 135 Md.App. at 605–14, 763 A.2d at 275–80. National Waste argued that notwithstanding the zoning approval, the County prevented it from operating the rubble landfill within the time prescribed by the county code and, therefore, the special exception did not lapse. *Id.* at

with the permit process constitutes such notice is out of step with several of the cases that MRA cites. *See Powell v. Calvert County*, 368 Md. 400, 403–04, 795 A.2d 96, 98 (2002) ("[R]espondent was granted a special exception by the Board that permitted him to park excavation equipment on the premises. Subsequently, respondent began to store construction equipment and materials such as top soil and gravel."); *see also A Helping Hand, LLC v. Baltimore County* 515 F.3d 356, 358, 371–72 (4th Cir.2008) (proposed methadone clinic had been leased, had an open house, and was simply waiting to begin serving methadone to clients).

604, 763 A.2d at 274. The CSA agreed that the two-year period was tolled during the course of litigation.[6] *Id.* at 604–05, 763 A.2d at 275.

The intermediate appellate court observed that the County's persistent litigation was the chief reason for National Waste's failure to take action:

> It is clear that, since 1994, with the exception of the brief period from August 4, 1998 to November 19, 1998 ... the County has never taken any meaningful steps to include the Landfill in the SWMP. Therefore, MDE has not been able to undertake review of National's permit request, despite zoning approval from the Board. Although the trial and appellate courts of this State have ruled against the County virtually every step of the way, National is no further along in its quest to operate the Landfill than it was when it first began the project almost a decade ago. To the contrary, if the County is correct that the special exception has now expired, National's position has deteriorated substantially.

---

6. The CSA in *National Waste Managers, Inc. v. Anne Arundel County,* 135 Md.App. 585, 763 A.2d 264 (2000), *cert. denied,* 363 Md. 659, 770 A.2d 167 (2001), seemed to blend a vested rights theory with a theory of zoning estoppel. We discuss the latter theory, *infra.* Although the two theories can overlap, the difference between them has been nicely articulated in the Washington University Journal of Law and Policy as follows:

> Generally speaking, courts have applied two basic standards in determining whether a right has been acquired to complete a development conceived before the proposed or actual change in regulations. One of these, the "vesting rule," reflects principles of common and constitutional law and focuses on whether real property rights that cannot be taken away by government regulation have been acquired. The second standard, known as the "estoppel rule," derives from equity and focuses on whether it would be equitable to allow the government to repudiate its prior conduct. Under either the vested rights or estoppel standard, the landowner must demonstrate (1) the existence of a valid government act, (2) substantial reliance on the governmental act, (3) good faith and (4) that the acquired rights are substantial enough to make it fundamentally unfair to eliminate them.

> John J. Delaney, *Evolving Voices in Land Use Law: A Festschrift in Honor of Daniel R. Mandelker: Part IV: Discussions on the State and Local Level: Chapter 7: Federalism: Vesting Verities and the Development Chronology: A Gaping Disconnect?,* 3 Wash. U. J.L. & Pol'y 603, 606–07 (2000).

Indeed, National will have lost the proverbial war despite winning almost every battle.

To be sure, we do not fault the parties for exercising their legal rights. At the same time, we cannot disregard that delay is an inherent consequence of litigation, and the County's repeated attempts to litigate National's right to proceed with the Landfill ultimately made it impossible for National to comply with [the County expiration provision]. If the County were correct in its analysis as to tolling, it would mean that a developer facing a time-related condition could almost always be thwarted in its efforts by the inevitable delay resulting from litigation, regardless of the merits; the right to proceed would necessarily expire before a court could rule otherwise. We cannot accept that logic, which elevates legal gamesmanship to new heights. Here, National did not comply with § 12–107 because the County's exercise of its rights made it impossible for National to do so.

*Id.* at 607–08, 763 A.2d at 276.

The CSA cited several land use cases from other jurisdictions, which provided for tolling in the face of tactical litigation that had the affect of thwarting the effort of applicants to receive their variances. *Nat'l Waste,* 135 Md.App. at 609–13, 763 A.2d at 271–79. Notably, the CSA quoted with approval the following passage from *Fromer v. Two Hundred Post Associates,* 32 Conn.App. 799, 631 A.2d 347, 353 (1993):

In this case, the defendants complied with all the applicable regulations in obtaining their permits, and the plaintiff exercised his legal right opposing the granting of the permits before the appropriate boards and the courts. The defendants prevailed both before the regulating agencies and in the courts. Yet, six years later, the plaintiff is before this court arguing that because of the passage of time the inland wetlands permit has expired.

The regulatory process is not designed to be a spider's web, snaring one who follows all the regulations and statutes, obtains all the necessary permits, and successfully

defends a series of appeals, but then loses his right to proceed because the passage of time has caused the permits to expire.

(Emphasis removed).

MRA argues that *National Waste* "is important because it analyzes vested rights in County zoning in the context where there is no County building permit to be issued, but rather a State refuse disposal permit is to be issued for which County zoning approval is a prerequisite." MRA chooses the following language from *National Waste:*

> Like the special exception in issue here, permits are often conditioned upon commencement of the particular use within a specified period. 4 ZIEGLER, RATHKOPF'S THE LAW OF ZONING AND PLANNING, § 50.03 (4th ed. Rev. 1994). The majority view provides that a permittee may acquire vested rights to continue construction, or "to initiate and continue a use" when, in "good faith," and acting with diligence, the permittee "1) made a substantial change of position in relation to the land, 2) made substantial expenditures, or 3) incurred substantial obligations." *Id.,* § 50.04[.]

*Id.* at 608–09, 763 A.2d at 277 (emphasis omitted).

*National Waste* actually stands for a much narrower proposition than MRA suggests. The CSA's decision identified a "vested right" in a validly obtained special exception or variance only insofar that the County could not purposefully delay in order to cause the exception to expire. In this case there was no permit that expired before the County enacted Bill 91–10, which required, inter alia, that rubble landfills be built on sites of at least 100 acres. The Court did not generally address why or whether a vested right should attach early in a permitting stage.

For all of these reasons, we conclude that there was "substantial evidence" in the record to support the Board's findings, made through the Hearing Examiner, and the Board

applied correct principles of law in making its decision on the vested rights issue.[7]

### Whether Application Of Bill 91–10 To MRA Was Arbitrary And Capricious

 MRA argues that Bill 91–10 unfairly targeted MRA and that Harford County's application of Bill 91–10 to MRA was arbitrary and capricious. The Board rejected MRA's argument that Bill 91–10 was arbitrary and capricious, noting that Bill 91–10 applied to all rubble landfills in Harford County and that there were sufficient reasons for deeming it emergency legislation: "Council meetings and public hearings were well attended, often to overflowing with citizens appearing in opposition to, not one, but five landfill operations either operating or proposed." The Board's finding regarding the arbitrary and capricious nature of Bill 91–10 will itself be deemed "arbitrary, unreasonable and capricious" if we find that it was made "without substantial supporting evidence." *Tauber v. County Bd. of Appeals for Montgomery County,* 257 Md. 202, 212, 262 A.2d 513, 518 (1970).

There is sufficient evidence on the record to support the Board's finding under the "substantial evidence" standard. There were four other proposed rubble landfill projects at the time Bill 91–10 passed, some of which were also negatively affected. Arden McClune, Chief of Capital Planning and Development for the Department of Parks and Recreation, testified that in addition to MRA's proposed landfill, the County was looking at plans for the Tollgate, Spencer's, and rubble landfills. Bill 91–10 also would have applied to the proposed Harford Sands/Fort Hoyle landfill, which was not yet operational and had prompted citizen concerns about

---

7. Finally, because MRA has no vested property right in this matter, its argument that it has a federally protected right in violation of 42 U.S.C. § 1983 (2006) also fails. State law creates and defines the parameters of a plaintiff's property interest for Section 1983 purposes. *Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

traffic and proximity to a school. The record is replete with complaints of residents who lived near these landfills. It is not surprising that the result of this public outcry was a tightening of the zoning laws with respect to rubble landfills.

MRA argues that because of the animus towards the proposed rubble landfill, the County singled out MRA's proposal when passing Bill 91–10 and points to testimony indicating that the County was poised to stop MRA in its efforts. We briefly discussed this argument in *MRA II,* 342 Md. at 505 n. 15, 677 A.2d at 582 n. 15, and brought cases to MRA's attention regarding the motivation of legislators. This included the Supreme Court's decision in *Daniel v. Family Security Life Insurance Company,* 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632 (1949), which noted that "a judiciary must judge by results, not by the varied factors which may have determined legislators' votes. We cannot undertake a search for motive." We also pointed out our holding in *Workers' Compensation Commission v. Driver,* 336 Md. 105, 118, 647 A.2d 96, 103 (1994), *cert. denied sub nom.* 513 U.S. 1113, 115 S.Ct. 906, 130 L.Ed.2d 789 (1995): "It is well-settled that when the judiciary reviews a statute or other governmental enactment, either for validity or to determine the legal effect of the enactment in a particular situation, the judiciary is ordinarily not concerned with whatever may have motivated the legislative body or other governmental actor." Those cases guide us here.

Thus, we shall not delve into the motives of legislators when there is ample evidence that Bill 91–10 was directed at landfills in general and was emergency legislation because of the great public concern over all of the proposed landfills at the time.

### 3. Estoppel

MRA argues that "Harford County is estopped from applying its newly enacted zoning regulation to MRA's property on Gravel Hill Road." MRA rests its argument both on principles of equitable estoppel and zoning estoppel.

### Equitable Estoppel

██ MRA acknowledges that "Maryland Courts have not expressly adopted the doctrine of 'zoning estoppel,'" and therefore commences its estoppel argument based on general principles of equitable estoppel. In this section we address MRA's general equitable arguments. In the next section, we consider its theory of zoning estoppel.

In *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 309, 936 A.2d 343, 360 (2007), we provided the following general definition of equitable estoppel:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

MRA looks to our decision in *Rockville Fuel & Feed Company v. Gaithersburg,* 266 Md. 117, 134, 291 A.2d 672, 680 (1972) for its recognition "[t]hat the doctrine of estoppel may be applied to municipal corporations[.]" This is true enough, although examples are scarce. Moreover, an examination of *Rockville Fuel* reveals that it lends little support to MRA.[8]

---

8. Rockville Fuel requested and received a special exception to construct and operate a concrete batching plant on its tract of land in Gaithersburg. *Rockville Fuel & Feed Company v. Gaithersburg,* 266 Md. 117, 119, 291 A.2d 672, 673 (1972). The Mayor and Council of Gaithersburg then enacted a text amendment to the Gaithersburg zoning ordinance which removed the "concrete or cement products manufacture" use as a use permitted by special exception in the subject zone and placed that use in the prohibited uses in that zone. *Id.* We held that even though the City of Gaithersburg enacted a zoning text amendment specifically to prevent Rockville Fuel from constructing and operating its concrete batching plant, the City was not estopped from taking action to deny Rockville Fuel the right to construct and operate its plant because Rockville Fuel had no vested rights. *Id.* at 134, 291 A.2d at 680. We also held that Gaithersburg could not be estopped from

As MRA concedes in its brief, the finding of vested rights was a basic premise of the *Rockville Fuel* Court's analysis of estoppel. Indeed the Court's primary analysis was that "the doctrine of estoppel would appear applicable to this case **only if . . . Plaintiff had a vested right. . . .**" *Rockville Fuel,* 266 Md. at 135, 291 A.2d at 681 (emphasis added). As we have already discussed, with only a permit, land purchase, and engineering studies, MRA has no vested rights in the property at issue. As such, *Rockville Fuel* does not support the notion that the county is estopped under the circumstances of this case.

The Court's second ground for rejecting Rockville Fuel's contention was that estoppel would not lie against a municipality "on the basis that someone previously purchased property in reliance upon the ordinance." *Rockville Fuel,* 266 Md. at 134, 291 A.2d at 680. MRA finds succor in the Court's insertion of the final nail in Rockville Fuel's coffin, when it added:

Furthermore, there is not the slightest suggestion offered by the Plaintiff that Gaithersburg was on notice that the property was being purchased with the intended purpose of applying for a special exception. Nor is there any evidence showing that the Plaintiff was induced by any conduct on the Defendant's part. Normally, mere silence, standing alone, does not create an estoppel where there is no duty to speak and, in any event, the silent party must have knowledge of the facts.

*Id.* at 134–35, 291 A.2d at 680–81. We do not read that comment as standing for the proposition that the mere purchase of land in reliance on the existing zoning is itself sufficient to create an estoppel that would preclude a change in the zoning, regardless of whether the zoning authority knew of the landowner's plans. Indeed, as we explain in the next section, we consider such a proposition unwise.

applying the zoning ordinance simply because the property to which the regulation is applied was purchased in reliance on a different version of that ordinance or in the absence of that ordinance. *Id.*

*Zoning Estoppel*

MRA urges that, if Harford County was not equitably estopped from applying Bill 91–10 to MRA, we should hold that specific principles of zoning estoppel apply here. In *Sycamore Realty Company v. People's Counsel of Baltimore County*, 344 Md. 57, 64, 684 A.2d 1331, 1334 (1996), without recognizing the doctrine of zoning estoppel in Maryland, we acknowledged its use in some other states, and described its character:

> A typical zoning estoppel scenario arises when the government issues a permit to a citizen that allows him or her to develop property in some way. Commonly, after the citizen has incurred some expense or has changed his or her position in reliance upon the permit, the property for which the permit was granted is rezoned so that the citizen's intended use is illegal. In such a situation, many courts allow the citizen to assert zoning estoppel as a defense to the government's attempt to enjoin the property use that violates the new zoning scheme.

The traditional, "black-letter" definition of zoning estoppel is:

> "A local government exercising its zoning powers will be estopped when a property owner,
>
> (1) relying in good faith,
>
> (2) upon some act or omission of the government,
>
> (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights which he ostensibly had acquired."

David G. Heeter, Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes, URB. L. ANN. 63, 66 (1971). Zoning estoppel was derived from equity principles and was intended to prevent the government from repudiating its prior conduct to the detriment of the property owner who relied on that conduct. URB. L. ANN. at 64–65. "The cases in which zoning estoppel is most often invoked and allowed ... fall

into four factual categories. They involve reliance upon (1) a validly issued permit; (2) the probability of issuance of a permit; (3) an erroneously issued permit; or (4) the non-enforcement of a zoning violation." URB. L. ANN. at 67.

We have reviewed the article by David G. Heeter relied upon in *Sycamore,* as well as more recent articles,[9] and have found the Heeter writing to be the most helpful in explicating the doctrine of zoning estoppel, and how it differs from the doctrine of vested rights. Heeter said that although some courts will blend the doctrines of zoning estoppel and vested rights, "the origins of the two defenses are quite different. The defense of estoppel is derived from equity, but the defense of vested rights reflects principles of common and constitutional law." Heeter, *supra,* at 64 (footnotes omitted). *See Sycamore,* 344 Md. at 67, 684 A.2d at 1334 (quoting Heeter's distinction between vested rights and zoning estoppel).

Heeter also parsed the element of "good faith" by the property owner:

> The first element of zoning estoppel requires that the property owner "relied in good faith" on the conduct of the government. In essence it focuses upon the mental attitude of the owner when he acted.
>
> * * *
>
> In category one, the courts will find that a property owner acted in good faith, if, knowing that rezoning was at least possible, he did not accelerate his development or increase his investment or obligations in an effort to establish such an apparent degree or amount of reliance as to prevent the rezoning. It is probably accurate to paraphrase

---

9. *See* Karen L. Crocker, Vested Rights and Zoning: Avoiding All–or–Nothing Results, 43 B.C. L.Rev. 935, 936–7 (2002) (discussing developers' expenses and governmental interests); Delaney, *supra* note 9; Robert M. Rhodes, et al, *Vested Rights: Establishing Predictability in a Changing Regulatory System,* 13 Stetson L.Rev. 1, 3 (1983). The eminent treatise *Rathkopf's Law of Zoning and Planning* also contains a thorough discussion of equitable estoppel. 4 Arden H. Rathkopf, et al., *Rathkopf's Law of Zoning and Planning* §§ 70:26–70:36 (2009).

this test as requiring that the owner act with honest intentions.

Heeter, *supra*, at 77–78.

The third element of zoning estoppel, "substantial reliance" is "the one which most often determines the outcome of the cases." Heeter, *supra*, at 85. According to Heeter's research in 1971,

> A majority of the courts utilize what may be described as the "set quantum test." Under this test, an owner is entitled to relief if he has changed his position beyond a certain set degree or amount, measured quantitatively. The problem with this test is that the courts have not set the requisite degree or amount with any precision.
>
> The majority of the courts appear to require some physical construction to establish substantial reliance.

*Id.* That lack of precision is evident in more written decisions as well. As one commentator wrote in 2000:

> Courts have used two tests in their "substantial reliance" inquiry, the first being the "proportionate/ratio test," which examines the percentage of money spent or obligations occurred as compared to the total cost of the completed project. A second test, known as the "balancing test" evaluates the public interest against the right of the property owner to make use of the land, as well as the land owner's expenses and obligations already incurred. While the proportionate/ratio test and the balancing test offer greater opportunity for achieving an equitable result than the building permit test, they are totally subjective in character and thus less reliable as precedent.

John J. Delaney, *Evolving Voices in Land Use Law: A Festschrift in Honor of Daniel R. Mandelker: Part IV: Discussions on the State and Local Level: Chapter 7: Federalism: Vesting Verities and the Development Chronology: A Gaping Disconnect?*, 3 Wash. U. J.L. & Pol'y 603, 608–09 (2000).

We have not explicitly adopted the doctrine of zoning estoppel, but we recognize that as zoning and permitting processes

become more complex, the need for such a doctrine grows. Today, land use is much more highly regulated than it was fifty years ago-environmental concerns abound, and vehicular traffic demands seem to mushroom every year. Thus, a property owner who seeks to build or develop may well incur sizable expenses for experts in engineering, various environmental fields, traffic flow, archeology, etc., before putting a spade into the ground. With increasing public appreciation for open space and environmental protection causing apprehension about new construction, the likelihood a developing landowner will face serious opposition is high. Indeed, a developer faces quite a tortured process. *See* Karen L. Crocker, *Vested Rights and Zoning: Avoiding All–or–Nothing Results,* 43 B.C. L.Rev. 935, 936–7 (2002) (discussing developers' expenses and governmental interests).

But we also cannot ignore a local government's responsibility to its residents, and thus, Maryland courts should not apply the doctrine casually. As open space disappears, and scientific knowledge about the adverse environmental impact from people's use of land grows, local governments struggle to balance the legitimate interests and rights of landowners wishing to develop against equally legitimate environmental and community concerns. Due to the delicacy of this balancing act, and the overriding need to protect the public, local government cannot always chart a steady course through the Scylla and Charybdis of these disparate interests. Land developers must understand that, to a *limited* extent, the local government will meander, and before they incur significant expense without final permitting, they must carefully assess the risk that the government will shift course. On the other hand, there may be situations in which the developer's good faith reliance on government action in the pre-construction stage is so extensive and expensive that zoning estoppel is an appropriate doctrine to apply.

Yet, we stop short of adopting zoning estoppel in this case as the facts set forth in this record do not support its application. For decades Maryland has maintained a stricter stance than most other states in protecting government's right

to downzone in the face of planned construction. *See* 9–52D Patrick J. Rohan & Eric Damian Kelly, *Zoning and Land Use Controls* § 52D.03 (2009) (comparing Maryland to other states). Although we may sometimes adopt a new principle of law in a case in which the facts do not fit the doctrine, the doctrine of equitable estoppel is so fact-specific that it would be imprudent to depart from this history before we are faced with a case presenting circumstances for its application.

 We think that zoning estoppel must be applied, if at all, sparingly and with utmost caution. *See, e.g., Bauer v. Waste Mgmt. of Connecticut, Inc.*, 234 Conn. 221, 662 A.2d 1179, 1193 (1995) ("In municipal zoning cases, however, estoppel may be invoked (1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulations."). Squaring with this cautious approach, we conclude that the burden of establishing the facts to support that theory must fall on the person or entity claiming the benefit of the doctrine.

This burden of proof will come into play as we don the cloak of the doctrine to assess its fit to the facts in the record. In doing so, we conclude that ultimately, zoning estoppel does not fit these facts because there was no substantial reliance by MRA. Although Heeter and some courts treat "good faith" and "reliance" as separate elements, we discuss them together, as they are so closely entwined.

 Under the theory of zoning estoppel, if the developer **"has good reason to believe, before or while acting to his detriment, that the official's mind may soon change,** estoppel may not be justified." Robert M. Rhodes, et al, *Vested Rights: Establishing Predictability in a Changing Regulatory System*, 13 Stetson L.Rev. 1, 4 (1983) (emphasis added). At the heart of establishing "good faith" is proof that the claimant lacked knowledge of those facts that would have put it on sufficient notice that it should not rely on the government action in question. *See* Heeter, *supra*, at 77–82.

Many facts were available to MRA at the time of its February 1990 purchase of the Property that should have alerted them to the real possibility that its plans for a rubble landfill would not come to fruition. On November 14, 1989, the County Council voted for the inclusion of the Property in the SWMP by a favorable vote of four council members, with two members abstaining because they felt they had inadequate information, and one member abstaining because his son was the president of MRA. Thus, the inclusion in the Plan was achieved by a fragile majority, and MRA knew, as did the Council when it voted, that MRA had no permit from the MDE and many additional steps had to be taken before MRA could actually construct the rubble landfill. Inclusion of the Property in the County SWMP was a necessary, but not a sufficient step in the process of obtaining a state rubble fill permit from MDE. *See* Md.Code (1982, 2007 Repl.Vol.), § 9–210 of the Environment Article. Even at the November 14 hearing, the Council President told MRA that "what we are doing tonight is approving a process. We are not exactly approving the landfill site. We are approving a step in a process."

As MRA president Schafer acknowledged at the hearing below, there was "strong" public opposition to the rubble landfill by "hundreds" of persons at the November 7 and 14, 1989 hearings.[10] Shortly thereafter the membership of the County Council changed when Council President Hardwicke resigned and Jeffrey Wilson replaced him in January 1990. Both of these events occurred before MRA closed on its purchase on February 9, 1990.[11] Mr. Hardwicke was one of

---

10. The Council's attorney had advised the Council that it must act on the matter before November 17, or MDE would treat MRA's request as having been approved.

11. After the February 9 closing, the membership of the County Council changed even more due to the November 1990 general election. "As a result of this election, most of the former council members were replaced by newly elected members who had campaigned in opposition to the Gravel Hill Road rubblefill." *MRA II*, 342 Md. at 481 n. 1, 677 A.2d at 570 n. 1.

the four council members who voted on November 14 to include the property in the SWMP. The Hearing Examiner found: "At a County Council meeting on February 6, 1990, the Council again debated the terms of the rubblefill's acceptance into the [SWMP]." He also found: "At some time during this period in February 1990, Council President Jeffrey Wilson informed John Schafer, Richard Schafer's father, and [who was] a fellow Council Member, that he planned to take steps to remove MRA from the County [SWMP]. MRA purchased the Gravel Hill property on February 9, 1990." [12] Richard Schafer denied speaking to his father or to other council members about Wilson's plan, but did not state that he was unaware of Wilson's intent.

The Hearing Examiner did not make a specific finding on the question of whether MRA president Shafer knew that there was no longer a majority of members on the newly constituted County Council who supported locating a rubble fill on the Property. This absence is not critical because the knowledge of these facts was certainly available to MRA, even if it did not have actual knowledge. *See Bauer*, 662 A.2d at 1194 (holding that party claiming zoning estoppel must "exercise due diligence to ascertain the truth and not only lac[k] knowledge of the true state of things, but also had no convenient means of acquiring that knowledge"). Certainly, MRA failed to prove that it exercised due diligence to ascertain the facts or that it had convenient means of acquiring those facts when local people were in full possession of them.

██ Additionally, the closing on MRA's purchase of the Property is not the definitive mile-marker in a zoning estoppel analysis. Generally, purchase of land, by itself, is insufficient

---

**12.** In summarizing the testimony of Schafer, president of MRA, the Hearing Examiner wrote:

The witness also recalled testimony of many of these witnesses regarding potential noise, dust, well water issues, truck traffic, and very strong citizen opposition and the concern of certain Council Members which was expressed to him prior to his purchase of the property, during the two hearings held by the Council and for many months thereafter.

to constitute "substantial reliance." *See* Heeter, *supra*, at 86 n. 81. (listing cases following this rule). To hold otherwise would mean that a purchaser could lock in the zoning of any parcel simply by the act of purchasing property and asking for a permit. For us to decide that the good faith reliance element of zoning estoppel is established by proof that an entity purchases land for the purpose of constructing a highly controversial rubble landfill based on a vote by the County Council approving one step in the State permitting process, while knowing that the new membership of County Council likely opposes that use, would disregard the caution with which we approach such a doctrine.

Thus, MRA must prove substantial reliance by something other than its purchase of the Gravel Hill property. It attempts to do so by focusing on the expenses it incurred for engineering fees during the period of its alleged good faith reliance. As Heeter said, most zoning estoppel cases turn on the element of substantial reliance, which the majority of courts define as a party's changing position in reliance on the government "beyond a certain set degree or amount, measured quantitatively." *See* Heeter, *supra*, at 85. As MRA is claiming reliance on the vote taken at the November 14, 1989 hearing, we examine what facts it brought forth to prove its reliance on that vote.

Although MRA asserts in its brief that, relying on the County's action, it "proceeded to spend over a million dollars on the purchase of the property and on engineering fees[,]" it gives us no extract references to support this statement. We know that the land cost $732,500, but as we have said, land purchase is not sufficient to prove detrimental reliance, and MRA gives us no specifics about the balance of the alleged costs.[13] We have searched the record extract ourselves and find only the following:

- John Wirth, engineer hired by MRA was first contacted about the Gravel Hill property in August 1989. According

---

13. MRA has the responsibility to support its factual assertions by citing pages of the record extract. *See* Md. Rule 8–504(a)(4).

to Wirth, it "may have been November of '89" when he began work on Phase II.

- MDE gave Phase I approval to MRA's project on November 20, 1989.

- MRA filed Phase II Engineering Report with MDE on November 28,1989.

- Wirth sent a letter to the MDE containing an addendum to the Phase II report on 1/8/90.

Richard Schafer testified that MRA spent $25,000 on Phase I engineering fees, and in excess of $300,000 on Phase II & III engineering fees, **but did not specify when.** The evidence in the record only shows that MRA expended $25,000 on engineering fees for work done sometime between August 1989 and November 20, 1989, the date MDE gave its approval for Phase I. These fees could well have been incurred before the November 4 hearing date. This record does not suggest, let alone prove, that the $25,000 was spent in reliance on the vote for inclusion in the SWMP at the November 14 hearing.

As for the additional $300,000 allegedly spent on engineering fees, there was just no testimony or any exhibit that would show when MRA incurred liability for that amount, i.e., when the work was done by the engineering firm. The record shows that work for Phase II (or some of it at least) was done sometime between August 1989, and November 28, 1989, when Wirth sent the Phase II report to MDE. We have found no evidence about how much of this Phase II work was done before November 14, 1989, and how much after. Any work done prior to November 14 clearly would not support MRA's estoppel theory. But the timing is critical even with respect to engineering work done after November 14. If MRA continued to incur engineering fees, on Phases II or III in the face of public actions by the County Council to block the rubble fill, the decision to do so must be considered an "increase [in] his investment or obligations in an effort to establish such an apparent degree or amount of reliance as to prevent the rezoning." Heeter, *supra,* 78.

In short, all we glean from the record is that MRA closed on the land on February 6, 1990, after the council's November 14, 1989 vote to include the Property in the SWMP. There was insufficient evidence to show how much, if any, of the engineering fees were incurred after and in good faith reliance upon the results of the November 14 hearing. Bald allegations and general testimonial statements that MRA spent $300,000 on engineering fees are simply insufficient to meet MRA's burden to prove the fact and extent of its reliance on the County Council's action.

Accordingly, MRA has failed to establish the necessary good faith reliance on the County Council's vote to include the Property in its SWMP either through purchase of the property or engineering expenses, or both.

For all of the above reasons, MRA has not proven zoning estoppel against the County according to the criteria used in states that have adopted that doctrine.

### 4. Zoning Violations through Landfill Operation

MRA further argues that the operation of a rubble landfill would not violate Harford County zoning provisions aside from those contained in Bill 91–10. Because we hold that MRA is subject to the terms of Bill 91–10, we need not reach this issue.

### 5. Non–Conforming Use

MRA argues that the use of its property prior to the Board's ruling was a valid, nonconforming use, and therefore insulated MRA's planned landfill from further zoning regulation. This argument is without merit.

It is long settled in Maryland law that a property is only protected against re-zoning by non-conforming use status if the property owner demonstrates that substantially all of the property was being used in a permissible means before a zoning change was enacted. *See, e.g., Bd. of Zoning Appeals of Howard County v. Meyer,* 207 Md. 389, 394, 114 A.2d 626, 628 (1955). Here, MRA has failed to prove this point.

In arguing for protection under a non-conforming use theory, MRA relies on an Industrial Waste Permit it received from Harford County in 1986, claiming that the use of the property pursuant to the Permit is sufficient to establish the valid, non-conforming use. The terms of the Permit itself illustrate the flaw in MRA's theory. The Permit applies to twenty-four acres of the property only, leaving a remainder of thirty-one acres that could not legitimately be used for the storage of industrial waste. Even assuming that MRA's use of the property under the terms of the Permit was identical to the use they pursue as a potential rubble landfill—which is by no means certain—MRA could not have used substantially all of the property for the indicated purpose. Therefore, MRA could not claim non-conforming use status for the property at the time of 91–10's passage.

### 6. Grading Permit

MRA argues that Harford County improperly failed to issue a grading permit to MRA. Because we hold that MRA is not entitled to relief from Bill 91–10 on grounds of preemption, constitutional violation, or estoppel, this argument is moot. We thus do not reach this issue.

### 7. County Site Plan Approval

Finally, MRA argues that the Board erred in prohibiting MRA from relying upon the 1989 County Site Plan approval. As we note in our discussion of vested rights, Part II.2, *supra*, rights in development do not vest under Maryland law unless a party has both obtained and exercised a permit or occupancy certificate. *See Powell*, 368 Md. at 411, 795 A.2d at 102. The Site Plan Approval did not cause MRA's rights to vest. This is an inadequate basis for relief, and we need not reach this issue.

**DECISIONS OF THE CIRCUIT COURT FOR HARFORD COUNTY IN BOTH CASE NO. 143 AND CASE NO.**

144 ARE AFFIRMED. COSTS TO BE PAID BY PETI-
TIONER.

HARRELL, J., dissents and files opinion in which BELL,
C.J., joins.

Dissenting Opinion by HARRELL, Judge, which BELL,
C.J., joins.

The Court of Appeals again wimps-out on adopting the
doctrine of zoning estoppel, the contours of which are well-
established in a number of our sister states. In this latest
missed opportunity, Appellant, Maryland Reclamation Associ-
ates, Inc. ("MRA"), contends compellingly that we should
embrace the principles of zoning estoppel and hold that Appel-
lee, Harford County, is estopped from applying the provisions
of Harford County Bill 91–10 [1] to Appellant's proposed opera-
tion of a rubble landfill on Appellant's property. The Majority
opinion rebuffs Appellant's argument. I disagree with the
Majority opinion in this regard and would hold, under zoning
estoppel principles, that Appellee is estopped from applying
the provisions of Bill 91–10 to Appellant's proposed rubble
landfill, based on Appellee's prior approvals of Appellant's Site
Plan, its inclusion of Appellant's rubble landfill in the County's
Solid Waste Management Plan ("SWMP"), the official assur-
ances it gave to Appellant that construction could proceed, and
Appellant's substantial expenditures made in good faith reli-
ance upon such assurances. Thus, I would reverse the judg-
ment of the Circuit Court for Harford County.

## I. Facts

In the late summer or early fall of 1989, Richard Schafer,
the President of MRA, met with Thomas Smith, then the
Director of Public Works for Harford County, to discuss
amending the Harford County SWMP to include certain prop-
erty on Gravel Hill Road which Appellant intended to pur-

---

1. Harford County Bill 91–10 imposes certain minimum lot size and
setback requirements that Appellant contends its property and proposed
use cannot meet.

chase and on which it would establish a proposed rubble landfill. MRA submitted site plans for the proposed landfill, which were reviewed by Harford County's Department of Public Works, Department of Planning and Zoning, and Department of Environmental Affairs. The plans also were discussed with then County Executive Habern Freeman, who indicated that he would like to see the project proceed.

At the time MRA filed its rubble landfill permit application with the Maryland Department of the Environment ("MDE") on 22 September 1989, Harford County maintained a stated policy of its County Council approving or disapproving proposed rubble landfills concurrent with Phase I of MDE's three stage permit review process. According to Director Smith, the purpose of this policy was "to save the owner/applicant[ ] a lot of time and money that would be expended on a project if the Council elected not to approve it." The policy was adopted in the aftermath of an experience involving the review of another rubble landfill application for a different Harford County rubble landfill, Oak Avenue, which underwent County review during Phase III of MDE's permit review process.

When Harford County officials, including the County Executive, indicated a positive response to MRA's landfill proposal, MRA hired engineers and hydrogeologists to prepare Phase II and III plans, as required by state statute. The Phase I engineering fees were approximately $25,000. According to the record, at this time, Harford County encouraged MRA to go forward with the project.

In the fall of 1989, the Harford County Council held public hearings to consider MRA's proposed rubble landfill. At the 7 November 1989 hearing regarding the proposal to amend the County SWMP to include MRA's proposed Gravel Hill property and to consider zoning approval of the Site Plan, Council member Barbara Risacher stated:

> We've made the decision in the past as a policy decision that we would either accept or deny rubble fills at stage one; so this one, if it has gotten approval for stage one by the State,

is at the level that we agreed that we would entertain these things.

At the continued hearing on 14 November 1989, Council President John Hardwicke announced that the County's role in the permitting process was not a technical, scientific review, but was a political decision-making process:

> We are sitting here as your local political board, and it is our duty to try and determine what is best politically with respect to this precise location. We are more or less your neighbors and local elected officials. We are here to deal with it more or less as a political and policy matter affecting Harford County. If this Council approves the petition, then the State holds hearings which deal with scientific features, safety and geology, underground water problems and those scientific questions. This is not a scientific hearing. This is more or less a political situation to determine the matter of location.

After the conclusion of the 14 November hearing, the County Council approved the zoning Site Plan, including required buffers and landscaping, and the inclusion of the Gravel Hill property in the County SWMP.[2] The Department of Public Works and the County Council imposed twenty-seven separate conditions on the SWMP approval, including that a grading permit be issued for the site. Public Works Director Smith testified that, apart from obtaining a grading permit, there were no other County approvals of any kind contemplated or required after the Council included MRA's facility in the SWMP and approved MRA's Site Plan. Smith further testified that the County policy was, at this point, to turn the balance of the rubble landfill permitting process over to the State be-

---

**2.** According to the record, Council members Hardwicke, G. Edward Fielder, J. Robert Hooper, and Frederick Hatem voted to include Gravel Hill in the SWMP and the Site Plan. Council members Risacher and Joanne Parrott abstained, citing the need for more information on asbestos disposal and the presence of three rubble landfills competing in operation at one time. Council member John Schafer abstained because his son is MRA's President.

cause the County's planning process was finished at the time of SWMP approval.

On 16 November 1989, the County Council transmitted to MDE its 14 November 1989 decision to include MRA's site in the County's SWMP. MDE gave Phase I approval for MRA's rubble landfill on 20 November 1989. MRA filed subsequently its Phase II and III plans with the MDE. The Phase II and III engineering fees were in excess of $300,000.

MRA purchased the Gravel Hill property on 9 February 1990. According to MRA, it would not have purchased the property if the County Council had not voted to include the site within the SWMP, approved the Site Plan, and encouraged the project otherwise because MRA would not have been able to obtain financing for the purchase.

On 13 February 1990, four days after MRA closed on its acquisition of the Gravel Hill property, a re-constituted County Council[3] attempted to rescind the prior SWMP approval through the enactment of Council Resolution 4–90.[4] According to MRA, this action was part of a calculated process by the County Council designed to prevent MRA from proceeding with its plans to establish a rubble landfill on the land it had just purchased. As a result of the County Council's approval of Resolution 4–90, MDE interrupted processing MRA's Phase II and III rubble landfill permit application in May 1990.

In response, MRA sued Harford County in the Circuit Court for Harford County, seeking a determination that Reso-

---

**3.** The record reflects that, in January 1990, Council President Hardwicke resigned to accept a position as the first Chief Administrative Law Judge of the newly formed State Office of Administrative Hearings. The Council appointed Jeffrey Wilson to fill the vacancy left by Council President Hardwicke's departure. Council President Wilson retained his position by winning the November 1990 general election for Council President.

**4.** At the final vote on Resolution 4–90, Council members Schafer, Fielder, and Hooper abstained, the latter on advice from the Ethics Board because he was a principal in Harford Sanitation, a trash collection business. Council members Hatem, Risacher, Parrott, and Wilson voted to adopt the resolution.

lution 4–90 was invalid. The Circuit Court, on 10 October 1990, found in favor of MRA, holding expressly that MRA's rights in the SWMP approval vested upon the 14 November 1989 County Council decision. Following the Circuit Court's decision, MDE resumed processing of MRA's state permit application, notifying the County Council of this fact in a letter dated 18 January 1991.

At this point, the County Council,[5] shifting gears in pursuit of its new agenda, jettisoned the prevailing policy that local zoning approval or disapproval took place during Phase I of MDE's permit review, introducing on 12 February 1991 and enacting as emergency legislation Council Bill 91–10 on 19 March 1991. Bill 91–10 contained new minimum lot sizes and setback requirements which, according to MRA, the Council knew MRA's Gravel Hill property and approved site plan could not meet. James Vannoy, staff to the Harford County Council and draftsman of Bill 91–10, testified that he was instructed by the Council to draft Bill 91–10 as emergency legislation so that it could take effect before MDE issued a final State permit to MRA.

Following enactment of Bill 91–10, the County Council began to pressure MDE to halt again the State permitting process. Council President Wilson sent a copy of Bill 91–10 to MDE on 25 April 1991. MDE responded by stating that it would continue processing MRA's application. On the same day, William G. Carroll, Harford County's Director of Planning and Zoning since September 1986, told MRA that it was the County's position that MRA's property did not comply with the new requirements imposed by Bill 91–10. On 7 May 1991, Assistant County Attorney Jeffrey Blomquist advised

---

5. By this point, the makeup of the Council had shifted considerably from those persons who served when the 14 November 1989 approvals were given. Apparently, the fact that the prior County Council members voted to include the Gravel Hill proposal in the SWMP contributed to the outcome in the November 1990 election. Following that election, the County Council consisted of Council President Wilson and Council members Parrott, Susan Heselton, Theresa Pierno, Barry Glassman, Robert Wagner, and Philip Barker.

MDE that MRA's property no longer met County zoning requirements. Nevertheless, MDE granted MRA's Gravel Hill property Phase II and Phase III approval, and, on 28 February 1992, MDE issued to MRA a permit to operate a rubble landfill at Gravel Hill, expressly conditioning the permit upon MRA's compliance with all local land use requirements, thus leaving MRA to battle with the County in the present litigation.

MRA challenged administratively Harford County's application of Bill 91–10 to MRA's Gravel Hill property, claiming that effectively the Bill prevented MRA from operating a rubble landfill on the site and that, due to the property's status as an industrial waste disposal facility and the fact that it had been mined extensively for natural resources deposits by a prior owner, MRA could not use the property for any purpose other than a rubble landfill and receive a reasonable economic return. Rejecting all of MRA's claims, including zoning estoppel, the County Zoning Administrator and the County Zoning Board found that Harford County was not precluded from applying Bill 91–10 to the Gravel Hill property because the inclusion of a proposed rubble landfill in the SWMP, by itself, did not grant the applicant the final authority to operate that use at that site without the additional acquisition of a State permit. On judicial review sought by MRA of that decision sought by MRA, the Circuit Court for Harford County held, among other things, (1) that the evidence required to support a zoning estoppel claim is the same as that required to meet the vested rights test applied in Maryland, and (2) that, applying the vested rights test, MRA had no basis upon which to rely for its expenditures until after the permit was issued by MDE.

Prior to the Court of Special Appeals consideration of MRA's appeal in the present case, we issued a writ of certiorari, 406 Md. 743, 962 A.2d 370 (2008), on our initiative, to consider, *inter alia,* whether the County is estopped, under principles of zoning estoppel, from applying the provisions of Bill 91–10 to MRA's proposed operation of the rubble landfill on its property pursuant to its State-issued permit when,

according to MRA, it purchased the property and expended considerable sums on engineering fees in justifiable reliance on the County's approval of the Site Plan and SWMP approval during Phase I of MDE's rubble landfill permitting process.

## II. The Doctrine of Zoning Estoppel Generally

The most widely-accepted statement of the doctrine of zoning estoppel may be traced to a 1971 article, in which the following principle appears: "A local government exercising its zoning powers will be estopped when a property owner, (1) relying in good faith, (2) upon some act or omission of the government, (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights which he ostensibly had acquired." David G. Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes,* 1971 Urb. L. Ann. 63, 66 (1971); Robert M. Rhodes, et al., *Vested Rights: Establishing Predictability in a Changing Regulatory System,* 13 Stetson L.Rev. 1, 3 (1983). *See also* Walter F. Witt, Jr., *Vested Rights in Land Uses—A View from the Practitioner's Perspective,* 21 Real Prop. Prob. & Tr. J. 317, 319 (1986) ("The doctrine of equitable estoppel provides that the right to use or develop land cannot be infringed by legislative action when the owner or developer of such land has in good faith relied upon some act or failure to act by a governmental body and made a substantial change in position.").

Where zoning estoppel is recognized and applied, the government "is prevented from applying any future incompatible, albeit legal, regulations to the property." Kenneth R. Kupchak, et al., *Arrow of Time: Vested Rights, Zoning Estoppel, and Development Agreements in Hawai'i,* 27 Hawaii L.Rev. 17, 18 (2004). *See also* 4 Arden H. Rathkopf, *The Law of Zoning and Planning* § 70.9 (2009) ("State courts may apply the principles of equitable estoppel to prevent the enforcement of otherwise applicable regulations where, under the specific facts of the cases involved, it would be inequitable for the restriction to be enforced."); Lynn Ackerman, *Comment:*

*Searching for a Standard for Regulatory Takings Based on Investment–Backed Expectations: A Survey of State Court Decisions in the Vested Rights and Zoning Estoppel Areas,* 36 Emory L.J. 1219, 1256 (1987) ("When a city or county passes a zoning ordinance that invalidates a landowner's intended use of his property, he may argue that the city or county should be estopped from enforcing the ordinance because of substantial expenditures he has made in reliance on the existing zoning of the property.").

Regarding the underlying policy rationale for the doctrine of zoning estoppel, Heeter notes that "[t]he cases allowing zoning estoppel hold, in effect, that local governments while exercising their zoning powers are accountable for their actions if they lead reasonable men astray." Heeter, *supra,* at 84. *See also* Ackerman, *supra,* at 1275 n. 22 ("The defense of estoppel is derived from equity and 'focuses upon whether it would be inequitable to allow the government to repudiate its prior conduct.") (quoting Heeter, *supra,* at 64–65). As stated by another commentator, "the policy underlying zoning estoppel is two-fold: hold the government to its commitments, and treat property owners who rely fairly." Kupchak, *supra,* at 24.

Heeter identifies four categories of cases in which a zoning estoppel claim may arise, the second of which is pertinent to the instant case, namely, those cases in which "a property owner applies for a permit and initiates development before it is issued, relying on circumstances indicating a probability that it will be issued." Heeter, *supra,* at 70. Such reliance may include a situation where the use or structure is permitted of right under the zoning ordinance or where a government official has assured the developer that he or she will be granted a permit. *Id.* at 70, 83.

In his article, Heeter explains the distinction between the doctrine of vested rights, which requires generally that a developer first obtain a permit before acquiring constitutionally protected rights in the property, and the doctrine of zoning

estoppel, as well as the confusion of many courts (such as in Maryland) regarding the two principles and their terminology:

The defense of estoppel is derived from equity, but the defense of vested rights reflects principles of common and constitutional law. Similarly, their elements are different. Estoppel focuses upon whether it would be inequitable to allow the government to repudiate its prior conduct; vested rights upon whether the owner acquired real property rights which cannot be taken away by governmental regulation. Nevertheless, the courts seem to reach the same results when applying these defenses to identical factual situations.

Heeter, *supra*, at 64–65 (internal citations omitted). *See also* Kupchak, *supra*, at 20 ("Although usually treated by courts and many commentators as interchangeable, the theories of vested rights and zoning estoppel are doctrinally distinct.") (internal citation omitted); Rhodes, *supra*, at 2 ("Although the doctrines of equitable estoppel and vested rights arise from distinct theoretical bases, Florida courts have employed these concepts interchangeably."); Grayson P. Hanes and J. Randall Michew, *On Vested Rights to Land Use and Development*, 46 Wash. & Lee L.Rev. 373, 383 (1989) ("Zoning estoppel, like other forms of estoppel, arises out of equity and is derived from fundamental concepts of justice and fairness."). Both "closely-related principles permit the government to retain flexibility in land use planning only if a property owner has not proceeded sufficiently along the development path that it would be unconstitutional or unfair to prevent it from completion." Kupchak, *supra*, at 18. *See also* Ackerman, *supra*, at 1256 ("The primary purpose of the doctrine of zoning estoppel is to prevent a city or county from creating a situation in which it would be inequitable or unjust to permit it to negate what it has done or permitted to be done."). Vested rights and zoning estoppel thus "counterbalance the government's unfettered ability to use its police power to regulate land uses, providing some insulation of the land development process from shifting political winds" and "the vagaries of vindictive officials." Kupchak, *supra*, at 18, 63. *See also* Ackerman,

*supra,* at 1272 (noting that zoning estoppel "particularly applies when a municipality attempts to negate action that it has taken or permitted to be taken").

Although key elements are roughly similar,[6] important differences exist between the vested rights doctrine, in which the court must determine whether an owner has a "legitimate claim of entitlement" based on an "affirmative governmental act," such as the issuance of a permit, and the doctrine of zoning estoppel, which concerns instead "whether the government has given official assurance" to the developer that construction has been approved and may proceed. Kupchak, *supra,* at 24–25 (noting that the courts' tendency to collapse the "significantly different" doctrines of vested rights and zoning estoppel into one by "rationalizing that the two analyses rarely produce a different result" is a "gross oversimplification"). *See also* Hanes, *supra,* at 388 (noting that zoning estoppel depends on the "existence of a governmental act or omission," while vested rights requires an "affirmative governmental act" such as the issuance of a permit).

Unlike the doctrine of vested rights, zoning estoppel "shifts the focus from the owner's irrevocable commitments to the government's process and whether it would be unfair to permit the government to exercise its regulatory power to change regulation after its act or omission has induced a property owner to alter its position in reliance." Kupchak,

---

**6.** One commentator explains that the "common factors considered by courts in applying either the doctrine of equitable estoppel or the rule of vested rights" include the following:

 1. The existence of a governmental act, such as approval of a zoning request or the granting of a building permit; ·
 2. Whether the property owner or developer acted in good faith without knowledge that new or changed regulations would affect his *expectations or plans;*
 3. Whether the property owner or developer made substantial investments or incurred obligations in pursuing the development in reasonable reliance upon a governmental act; and
 4. Whether any rights acquired by the owner or developer were so substantial that it would be fundamentally unfair to allow the government to prohibit or infringe on these rights.

Witt, *supra,* at 320–21.

*supra,* at 23–25 ("In a vested rights determination the focus is on the property owner's expectations and fundamental rights, while in analyzing zoning estoppel the focus is on the government's process and whether it induced the owner's reliance."). *See also* Ackerman, *supra,* at 1272 ("Although the vested rights doctrine emphasizes what the landowner has done, zoning estoppel examines the actions of both the landowner and the municipality."). Thus, when considering a zoning estoppel claim, a court must first determine "whether the government has given official assurance to the developer that the proposed project may proceed, and whether the owner relied on the official assurance to its detriment." Kupchak, *supra,* at 24. The key difference between the vested rights and zoning estoppel approaches then is one of timing, namely, determining "what government action in the development approval process gives a property owner the green light." *Id.* at 25. *See also,* Ackerman, *supra,* at 1256 ("Although there are apparent similarities in the requirements of vested rights and zoning estoppel, the latter is really a more flexible test that emphasizes principles of equity, rather than specific points in time that trigger vesting."). Once the government provides official assurances to the developer that construction may proceed, "the property owner is entitled as a matter of law to rely on that approval in making expenditures." Kupchak, *supra,* at 48.

Commentators argue that strict reliance on the vested rights doctrine, under which a developer first must obtain a building permit and commence meaningful construction under the permit, "has been widely criticized, even by courts that apply it, because it provides for certainty too late in the process, does not forestall litigation, and maximizes the owner's exposure to regulatory risk." *Id.* at 26. Instead, allowing room for both vested rights and zoning estoppel claims "inject[s] a measure of certainty in an otherwise uncertain process and attempt[s] to minimize the risk that the rug can be pulled out unexpectedly from a property owner after the government has given the green light to a use and the owner has started down the path in reliance." *Id.* at 63. On the

desirability of recognizing the doctrine of zoning estoppel, Rathkopf notes:

> Some states, notably Illinois, recognizing that some expenses, even very substantial ones, may necessarily be incurred in the prebuilding permit state of a land development project, have refused to follow the majority rule that expenditures incurred *prior* to the issuance of a building permit are of no avail. Those states have expressed the rule that to achieve a vested right which will be unaffected by the amendment of an ordinance, a landowner must have experienced a substantial change of position, expenditure, or increase of obligation either pursuant to a building permit *or in reliance upon the probability of its issuance.*

Rathkopf, *supra,* at § 70–19 (emphasis in original).

Regarding the question of good faith, Heeter notes that the court's focus is upon "the mental attitude of the owner when he acted." Heeter, *supra,* at 77. Thus, "the courts will find that a property owner acted in good faith if, knowing that rezoning was at least possible, he did not accelerate his development or increase his investment or obligations in an effort to establish such an apparent degree or amount of reliance as to prevent the rezoning." *Id.* at 78. In other words, the owner must "act with honest intentions" and refrain from "deliberately [trying] to increase his equities in some way." *Id.* at 78, 81. If the developer "has good reason to believe, before or while acting to his detriment, that the officials' mind may soon change, estoppel may not be justified." Rhodes, *supra,* at 4. *See also* Hanes, *supra,* at 398–99 ("Good faith . . . means that the landowner proceeds with his proposed development plans in accordance with a governmental approval without knowledge of a pending change in the zoning ordinance.").

In order to claim zoning estoppel, a plaintiff's reliance must be of a "substantial" nature. Heeter, *supra,* at 84. "Concern is for the economic hardship which the owner would suffer were the government allowed to have its way." *Id.* Specifically, "[t]he substantial change in position element involves ex-

penditures of money, the irrevocable commitment of resources, and the acceptance of liabilities in reliance upon the governmental act." Hanes, *supra*, at 400. In discussing what may constitute "substantial" expenditures, one commentator notes the numerous preparatory actions that developers must undertake before beginning construction:

> As a practical matter, a landowner who seeks to develop his land incurs expense even in preparing to apply for a permit. Then, too, the larger the development project proposed, the greater the expense in conforming to the requirements for making an application. Even an application for a permit to build a structure conforming to all regulations and intended for a permitted use on an established lot must be accompanied by a plot plan and architectural plans and specification. Large-scale projects may require a change of zone or an application for a special permit, the preparation of an environmental impact statement, and public hearings. They can also involve the services of attorneys, planners, engineers, appraisers, and environmentalists, and can require approvals from various agencies before a building permit for the first structure can be applied for.

Rathkopf, *supra*, at § 70.19.

Heeter's definition of zoning estoppel, or a definition that is substantially similar to Heeter's definition, has been adopted by courts in Connecticut,[7] Florida,[8] Georgia,[9] Hawaii,[10] Illi-

---

**7.** *See West Hartford v. Rechel,* 190 Conn. 114, 459 A.2d 1015, 1019 (1983) (noting that a municipality may be estopped from enforcing its zoning regulations when two elements are present: "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury") (quoting *Zoning Comm'n v. Lescynski,* 188 Conn. 724, 453 A.2d 1144, 1148 (1982)).

**8.** *See Villas of Lake Jackson, Ltd. v. Leon County,* 796 F.Supp. 1477, 1489 (N.D.Fla.1992) (holding that "equitable estoppel may create rights to obtain permits if the owner expends significant sums of money in reliance upon existing Zoning and Preliminary approvals obtained from the regulatory governmental body even though final approvals have not yet been obtained"); *Hollywood Beach Hotel Co. v. City of Hollywood,*

329 So.2d 10, 15–16 (Fla.1976) (adopting Heeter's definition of zoning estoppel and rejecting the defendant's "contention that the doctrine [of equitable estoppel] is inapplicable where actual physical construction has not yet begun"); *Jones v. First Virginia Mortgage and Real Estate Investment Trust*, 399 So.2d 1068, 1074 (Fla.Dist.Ct.App.1981) (holding that a claim of zoning estoppel may be viable "where one with a legally recognizable interest in property (1) has made such a substantial change in his position, (2) in good faith reliance upon some act or omission of the government, that it would be highly inequitable and unjust to destroy (3) the rights he has acquired" and noting that a municipal government may be estopped "if the change of position is induced by an official act performed under circumstances giving rise to a reasonable conclusion that the government knew or should have known that its act would be relied upon in that very manner"); *Town of Largo v. Imperial Homes Corp.*, 309 So.2d 571, 573 (Fla.Dist.Ct.App. 1975) (suggesting that neither obtaining a building permit nor making physical changes in the land in reliance on the existing zoning is a condition precedent to a claim of zoning estoppel, acknowledging that "[a] citizen is entitled to rely on the assurances and commitments of a zoning authority and if he does, the zoning authority is bound by its representations, whether they be in the form of words or deeds," and noting that "the theory of [zoning] estoppel amounts to nothing more than an application of the rules of fair play").

**9.** *See Barker v. County of Forsyth*, 248 Ga. 73, 281 S.E.2d 549, 552 (1981) ("Where a landowner makes a substantial change in position by expenditures in reliance upon the probability of the issuance of a building permit, based upon an existing zoning ordinance and the assurances of zoning officials, he acquires vested rights and is entitled to have the permit issued despite a change in the zoning ordinance which would otherwise preclude the issuance of a permit."); *North Georgia Mountain Crisis Network, Inc. v. City of Blue Ridge*, 248 Ga.App. 450, 546 S.E.2d 850, 852 (2001) ("The principle of equitable estoppel is applied to determine whether 'the landowner, relying in good faith upon some act or omission of the government, has made a substantial change in position or incurred such extensive obligation and expenses that it would be highly inequitable and unjust to destroy the rights he has acquired.' ") (quoting *Cohn Cmtys. v. Clayton County*, 257 Ga. 357, 359 S.E.2d 887, 889 (1987)).

**10.** *See County of Kauai v. Pac. Standard Life Ins. Co.*, 65 Haw. 318, 653 P.2d 766, 772 (1982) (noting the distinction between zoning estoppel and vested rights rules and stating that "[e]stoppel focuses on whether it would be inequitable to allow the government to repudiate its prior conduct; vested rights upon whether the owner acquired real property rights which cannot be taken away by government regulation") (quoting *Allen v. City and County of Honolulu*, 58 Haw. 432, 571 P.2d 328, 329 (1977)); *Life of the Land, Inc. v. City Council of City & County of Honolulu*, 61 Haw. 390, 606 P.2d 866, 902 (1980) ("The doctrine of equitable estoppel is based on a change of position on the part of a land developer by substantial expenditure of money in connection with his project in reliance, not solely on existing zoning laws or on good faith

nois,[11] South Dakota,[12] and Utah.[13]

---

expectancy that his development will be permitted, but on official assurance on which he has a right to rely that his project has met zoning requirements, that necessary approvals will be forthcoming in due course, and he may safely proceed with the project."); *Denning v. County of Maui*, 52 Haw. 653, 485 P.2d 1048, 1051 (1971) (holding that a zoning estoppel plaintiff "must show that [he or she] ha[s] been given assurances of some form by [the County] that [his or her] proposed construction met zoning requirements" and that he or she "had a right to rely on such assurances").

**11.** *See Pioneer Trust and Savings Bank v. County of Cook*, 71 Ill.2d 510, 17 Ill.Dec. 831, 377 N.E.2d 21, 26 (1978) (observing the general rule that, "where there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classifications") (quoting *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 16 Ill.2d 183, 157 N.E.2d 33, 37 (1959)); *Cos Corp. v. City of Evanston*, 27 Ill.2d 570, 190 N.E.2d 364, 367–68 (1963) (stating the "well-followed rule" that "plaintiff's substantial change in position by expenditures in reliance upon the probability of the issuance of a building permit, based upon the existing zoning ordinance and the assurances of the city officials, entitles it to issuance of the permit"). In *Cos Corp.*, the Supreme Court of Illinois explained the rationale behind its recognition of the doctrine of zoning estoppel:

> Where an individual or corporation expends substantial sums relying on the then existing zoning and zoning ordinances and proceeds to seek a permit in compliance with them, it would be a grave injustice to allow municipal officials to hold up action on issuance of a building permit until an amendatory ordinance could be passed changing the standards to be met so that a permit formerly lawful would now not be issued due to an abrupt change in the law.

*Cos Corp.*, 190 N.E.2d at 368.

**12.** *See Even v. City of Parker*, 597 N.W.2d 670, 675 (S.D.1999) (holding, based on equitable estoppel principles, that a municipality "may not, through its agents, affirmatively create an objectively reasonable impression in an applicant that he has fully complied with all zoning requirements and then proceed to withdraw permission after the applicant has taken steps towards construction which result in a substantial detriment to the applicant").

**13.** *See Fox v. Park City*, 200 P.3d 182, 191 (Utah 2008) (noting the "well-established" doctrine of zoning estoppel and holding that the doctrine "estops a government entity from exercising its zoning powers to prohibit a proposed land use when a property owner, relying reasonably and in good faith on some governmental act or omission, has made

### III. Prior Consideration of the Doctrine of Zoning Estoppel in Maryland

In general, Maryland courts have utilized exclusively the doctrine of vested rights in analyzing allegations of local government reneging on prior approvals of land use proposals such as the present one. *See, e.g., Rockville Fuel & Feed Co. v. City of Gaithersburg*, 266 Md. 117, 124, 291 A.2d 672, 675–76 (1972) (noting that, under the traditional vested rights test, which would have the effect of constitutionally protecting a property owner against subsequent changes in the zoning laws "prohibiting or limiting [a particular] use, the owner must (1) obtain a permit or occupancy certificate where required by applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use") (quoting *Richmond Corp. v. Bd. of County Comm'rs*, 254 Md. 244, 255–56, 255 A.2d 398, 404 (1969)).

Although we have not adopted previously the doctrine of zoning estoppel, the principles of equitable estoppel have been considered and applied by both Maryland appellate courts in claims brought against local governments in land use contexts. *See Permanent Fin. Corp. v. Montgomery County*, 308 Md. 239, 251–53, 518 A.2d 123, 129–130 (1986) (holding that, where a contractor relied on Montgomery County's prior reasonable and debatable interpretation of the statutory phrase "nonhabitable structures" and constructed its building based on that interpretation and with a valid permit, it would be inequitable for the County Board of Appeals to apply a changed interpretation to require removal of the building's fourth floor); *Bd. of County Comm'rs v. East Prince Frederick Corp.*, 80 Md.App. 78, 88, 559 A.2d 822, 827 (1989) (noting that, in order to demonstrate the reliance element of an equitable estoppel claim against a municipality, the party relying must be "misled

---

a substantial change in position or incurred such extensive obligations or expenses that it would be highly inequitable to deprive the owner of his right to complete his proposed development") (quoting *Western Land Equities, Inc. v. City of Logan*, 617 P.2d 388, 391 (Utah 1980)).

and change his or her position for the worse, believing and relying on the representations of the party sought to be estopped"); *Biser v. Town of Bel Air*, 991 F.2d 100, 104 (4th Cir.1993) ("Under Maryland law, equitable estoppel of a municipal corporation requires (1) an official act taken within the scope of authority; (2) an ambiguous statute or ordinance; and (3) detrimental reliance by a third party."). At least one Maryland case recognized the "significant" distinction between the law of vested rights and the "related but clearly distinct law of zoning estoppel." *Town of Sykesville v. West Shore Commc'ns, Inc.*, 110 Md.App. 300, 330, 677 A.2d 102, 116 (1996).

Without adopting the doctrine of zoning estoppel, this Court nonetheless acknowledged a possible definition of the concept. In *County Council of Prince George's County v. Offen*, 334 Md. 499, 639 A.2d 1070 (1994), we stated in a footnote:

"Zoning estoppel" is a doctrine under which, according to the jurisdictions that have embraced it, a local government will be estopped from exercising its zoning powers over subject property when a property owner, (1) relying in good faith, (2) upon some act or omission of the government, (3) has made such a substantial change in position or incurred such extensive expenses that it would be manifestly unjust to permit the government to destroy the rights of the property owner by subsequent regulation. We have never considered whether the doctrine should be applied in Maryland, and because of the limited scope of review of this case, we need not do so today.

*Id.* at 506 n. 4, 639 A.2d at 1073 (internal citation omitted). In *Offen*, we held that the Court of Special Appeals abused its discretion in raising, *sua sponte*, the doctrine of zoning estoppel (then an issue of first impression in Maryland), where it neither had been briefed nor argued in the trial or intermediate appellate court. *Id.* at 511, 639 A.2d at 1076. Thus, we did not reject for all time the doctrine of zoning estoppel in Maryland; rather, we stated that reaching a decision on its merits was inappropriate in the procedural posture of that case.

One year after *Offen,* the Court of Special Appeals attempted to resuscitate the doctrine of zoning estoppel as part of Maryland's land use law. In *Relay Improvement Assoc. v. Sycamore Realty Co.,* 105 Md.App. 701, 661 A.2d 182 (1995), the intermediate appellate court held that "the doctrine of zoning estoppel is applicable in Maryland" and adopted a "narrow version of the zoning estoppel doctrine . . . best . . . understood as a 'bad faith' exception to the vested rights rule." *Id.* at 716, 721, 661 A.2d at 189, 192. In articulating its conceptualization of the doctrine, the court held that "a zoning estoppel may not be found unless (1) the local government acts, or fails to act, in an arbitrary and unreasonable manner, (2) with deliberate intent to delay construction, and (3) the conduct at issue is the primary and proximate cause of the landowner's inability to vest his or her rights before a change in zoning occurs." *Id.* at 736, 661 A.2d at 199. Regarding the first two elements, the panel noted that the fact finder "must conclude that the actor omissions of government officials were deliberately calculated 'to deny a property owner his [or her] right to use this land in a currently lawful manner.' " *Id.* (quoting *Pokoik v. Silsdorf,* 40 N.Y.2d 769, 390 N.Y.S.2d 49, 358 N.E.2d 874, 876 (1976)).

In explaining its decision to adopt this particular rationale in *Sycamore Realty,* the intermediate appellate court posited that Heeter's definition of zoning estoppel conflicted with Maryland's stringent vested rights rule, which provides that "a landowner may rely on nothing less than a properly-issued permit, and that a substantial change in circumstances will not be found unless the landowner begins actual, above-ground construction." *Id.* at 725, 661 A.2d at 194. The court, however, also observed that strict application of the vested rights rule "may sometimes be unjust or unreasonable." *Id.* at 727, 661 A.2d at 194. Thus, the court explained it would adopt, as a supplement to the vested rights doctrine, a narrow zoning estoppel doctrine which would focus not on the landowner's good faith reliance, but on "the government's arbitrary and unreasonable conduct, as well as the causal relationship be-

tween the government's conduct and the landowner's inability to proceed to actual construction." *Id.*

Regretfully, in my judgment, this Court reversed, rejecting the narrow theory of zoning estoppel announced by the Court of Special Appeals. *See Sycamore Realty Co., Inc. v. People's Counsel of Baltimore County,* 344 Md. 57, 684 A.2d 1331 (1996). The Court noted that "[a]ny decision whether we should enunciate some, still narrower theory of zoning estoppel need not be decided in the instant case." *Id.* at 63, 684 A.2d at 1334. We stated that "we, like all of the other courts that have declined to adopt zoning estoppel 'recognize a legal defense cast in terms of whether the property owner acquired 'vested rights' to use his land without governmental interference.'" *Id.* at 66–67, 684 A.2d at 1336 (quoting Heeter, supra, at 64). The zoning estoppel rule announced by the Court of Special Appeals, despite being narrower than the broader definition posited by Heeter, was not compatible, in the Court's opinion, with Maryland's vested rights rule. *Id.* at 69, 684 A.2d at 1337. The door was left ajar, however, for future consideration of zoning estoppel when we stated that "[w]hile there may be some, still narrower theory of zoning estoppel that may be compatible with our vested rights rule, we need not decide that issue today because the facts in this case do not raise any form of zoning estoppel that this Court would recognize." *Id.*

In the next most recent consideration before the present one by a Maryland court of a zoning estoppel argument, the Court of Special Appeals (perhaps dis-spirited by this Court's earlier rebuffs) noted simply, in a footnote, that zoning estoppel is not recognized in Maryland. *P Overlook, LLLP v. Board of County Comm'rs,* 183 Md.App. 233, 255 n. 4, 960 A.2d 1241, 1253 (2008). Rather, the court found, citing our decision in *Sycamore Realty,* that "Maryland courts analyze such issues in terms of vested rights, not zoning estoppel." *P Overlook,* 183 Md.App. at 255 n. 4, 960 A.2d at 1253. The court nonetheless noted the earlier possible definition of zoning estoppel in *Offen* when it observed that:

"[u]nder the doctrine of zoning estoppel, a local government, acting in a governmental capacity, will be estopped to exercise its zoning powers over property when the property owner relied in good faith upon an act or omission of the local government and made 'such a substantial change in position or incurred such extensive expenses that it would be manifestly unjust to permit the government to destroy the rights of the property owners by subsequent regulation.' "

*Id.* (quoting *Offen*, 334 Md. at 505 n. 4, 639 A.2d at 1073).

### *IV. The Right Time and the Right Case—The Present Case*

MRA contends that the County should be estopped from applying its "newly" enacted zoning regulation, Bill 91–10, to MRA's property and the intended rubble fill on Gravel Hill Road, based on the doctrine of zoning estoppel. It argues that the County reversed its stated policy that the County's zoning approval was given coincident with Phase I of the State permit process, and that MRA relied upon this clear, succinct, and publicly-stated policy, along with the approval of its Site Plan and inclusion in the SWMP, to its detriment in purchasing the Gravel Hill property and expending substantial sums on engineering fees after it received County zoning approval. MRA also maintains that its reliance on the Site Plan and SWMP approvals was reasonable and in good faith, and that it would be unfair to require MRA to have foreseen, prior to the time it purchased the Gravel Hill property, that Council President Hardwicke would resign from the Council, that Mr. Wilson would be appointed to take his place as President, that President Wilson would be opposed to MRA's rubble landfill, and that Council members Wilson and Parrott would join him in actions to reverse the County's policy and effectively revoke MRA's Site Plan approval though the enactment (and attempted application to MRA's property) of Bill 91–10. Finally, MRA claims that, based upon this reliance, it proceeded to undertake "substantial" obligations, namely, spending over a million dollars on the purchase of the Gravel Hill property and

on engineering fees required to proceed through the State permitting process.

As a threshold matter, I believe that this Court should adopt in this case the principles of zoning estoppel expressed by Heeter and as followed in a number of our sister states. I maintain that our decision in *Sycamore Realty,* where we rejected the Court of Special Appeals's proposed narrower definition of zoning estoppel and held that Heeter's definition of zoning estoppel conflicted inherently with our strict doctrine of vested rights, misunderstood the key doctrinal distinctions between zoning estoppel and vested rights. As noted *supra,* the doctrine of vested rights has its foundations in common law and constitutional law and is designed to address situations where a property owner seeks constitutional protection from the local government's attempts to revoke a previously issued permit or approval. The central question in such a case concerns whether the holder of the permit or approval acquired a "legitimate claim of entitlement" to the permit or approval, based on its justifiable reliance and expenditures, such that its rights to the permit or approval are constitutionally protected. On the other hand, where the local government or authorities expressed specifically their approval of a proposed project and gave their "official assurances" that construction may proceed, the doctrine of zoning estoppel, with its foundations in notions of equity and fairness, should be available to the plaintiff who relies upon such affirmative actions by the government in undertaking substantial expenses and obligations necessary to a separate state permitting process. The two doctrines can co-exist in Maryland.

Zoning estoppel relieves the occasional otherwise harsh and unfair results that the strict application of the vested rights doctrine would tolerate. Here, MRA was required, as part of the State permitting process, to obtain County zoning approval and expend significant sums on the land purchase price and engineering fees, prior to proceeding to MDE's Phases II and III. Once MRA undertook those significant obligations, relying in good faith on the affirmative assurances of the County and its officials, it should be afforded some protection against

abrupt political shifts and resultant mere change of heart that seeks to prevent the development of its property in accordance with the State-issued permit. Requiring MRA first to obtain a permit, which, by State statute, could not be issued until attendant expenses were undertaken, as a prerequisite to protection under the vested rights rule is unfair. This case demonstrates the necessity and desirability of adopting the doctrine of zoning estoppel for Maryland to protect plaintiffs who must obtain approval at the County level as a preliminary to the State permitting process. As such, I would adopt Heeter's definition of zoning estoppel in Maryland.

Applying Heeter's definition to the present case, in order to estop the County from applying the provisions of Bill 91–10 to its Gravel Hill property, MRA must demonstrate that it relied in good faith upon some act or omission of the County and made "such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust" to frustrate its plan. Concerning the "act or omission" element, the County indeed appears to have had a well-established and publicly-stated policy of approving zoning compliance at the County level during Phase I of the MDE permitting process in order to save the applicant the time and expense of proceeding too deeply into the expensive and time-consuming State-issued permit process only to discover that the proposed use would not be acceptable under County land use regulations. In addition, MRA notes that the County Council voted to include the Gravel Hill property in the County's SWMP, subject only to fulfillment ultimately of the stated conditions, to approve the rubble fill Site Plan for the property, and that Harford County officials encouraged otherwise MRA to proceed with construction of the landfill. Such actions certainly constitute "official assurances" by the County to MRA, that MRA fulfilled the requirements for County approval of its landfill, and that it could proceed to undertake the expenses and obligations necessary to advance through Phase II and III of the MDE permitting process, assuming that it could meet the State's technical requirements.

Regarding good faith, there exists no evidence in the record to suggest that MRA "deliberately tried to increase its equities in some way." It incurred the expenses it alleges after it received approval of the Site Plan and following inclusion of the Gravel Hill property in the SWMP, and apparently undertook the obligations and costs only as necessary to proceed to Phase II and III of the state permitting process. As such, MRA relied in good faith upon the assurances given by the County when it expended the money to purchase the Gravel Hill property and for the engineering fees required in order to complete the State permitting process.

It is clear that MRA's reliance in this case was of a substantial and extensive nature. Although there are no hard and fast rules about what amount constitutes a "substantial" expenditure, it is clear to me that MRA's purchase of the property and the incurring of significant engineering fees was "substantial."

Finally, because zoning estoppel is grounded in equity, I would conclude that it would be "highly inequitable and unjust" to allow the County to apply Bill 91–10 to MRA's property and proposed rubble landfill, essentially preventing it from operating the landfill at all. Only the change in the makeup of the County Council (and attendant change of political mind), and the Council's concerted efforts to reverse its previously stated policy of giving local zoning approval during Phase I, prevented MRA from proceeding with establishment of the intended use. I agree with MRA that it would be "highly inequitable and unjust" to require it to have foreseen, when it undertook to purchase the property and incur the engineering fees, the subsequent chain of events that lead it to the position in which it found itself.

### V. Conclusion

The doctrines of vested rights, as applied in Maryland, and zoning estoppel, as envisioned by Heeter, are not, in my opinion, mutually exclusive or incompatible. The two doctrines may exist in tandem and apply to different types of situations. Where a plaintiff seeks constitutional protection

against a local government's attempt to revoke a permit and construction commenced under the permit, analysis under the vested rights doctrine is appropriate. Where, however, the local authorities have provided express and official assurances to a plaintiff regarding approval of its plans, zoning estoppel prevents a later purely political change of heart and frustration of the approved activity by the local government, so long as the plaintiff relied in good faith and incurred significant expenses or obligations in reliance on the officials' assurances. The present case is a strong example of the necessity for the doctrine of zoning estoppel in Maryland to protect property owners and others who rely on the affirmative assurances of local government. Thus, I disagree with the Majority opinion and would hold, in reversing the judgment of the Circuit Court for Harford County, that (1) the doctrine of zoning estoppel, as expressed by Heeter, is viable in Maryland, and (2) under the principles of zoning estoppel, the County should be estopped from applying the provisions of Bill 91–10 to MRA's Gravel Hill property and the proposed rubble landfill to be established there. Accordingly, I dissent.

Chief Judge BELL authorizes me to state that he joins in this dissenting opinion.

Opinion by ADKINS, Judge.

### On Motion For Reconsideration

Maryland Reclamation Associates ("MRA"), has filed a Motion for Reconsideration requesting that we reconsider that portion of our decision relating to zoning estoppel, which has been opposed by Harford County. MRA argues that we ignored evidence showing that it substantially relied in good faith on Harford County's vote to include the subject site in the County's Solid Waste Management Plan. MRA claims that there "was substantial evidence of the dates field work was performed, reports and addenda were submitted, and meetings with [the Maryland Department of the Environment] were held."

In support of this contention, MRA offers new citation to record extracts from *previous* appeals, which were *not in the*

*record* extracts for this case, and were not mentioned in the briefs, contending: "References were consistently made in the Joint Record Extract in this case to various documents referring back to the record extracts from the prior two cases with the designation E–1 and E–2." As support for this latter assertion, MRA cites to E. 515–16. These two extract pages simply contain statements by counsel that they were entering into evidence seven volumes of the record extracts from earlier appeals, known as *"MRA I"* and *"MRA II."* Counsel did not say, on these pages, that the records from these cases were introduced into evidence to show detrimental reliance. Indeed, these pages say nothing about why the record extracts were introduced. Accordingly, even if MRA had pointed in the briefs to E. 515–16 of this case, which it did not, careful review of those pages would give us no hint that these other record extracts had evidence *pertaining to MRA's claim of reliance.*

As we said in the opinion, "MRA has the responsibility to support its factual assertions by citing pages of the record extract. *See* Md. Rule 8–504(a)(4)." Op. at 61 n. 13, 994 A.2d at 878 n. 13. In *ACandS, Inc. v. Asner,* 344 Md. 155, 192, 686 A.2d 250, 268 (1996), Judge Rodowsky, writing for the Court, refused, on a Motion for Reconsideration, testimony contained in depositions which were not contained in the five volume, 2,437 page, joint record extract, explaining

> The liberalizing provision ... in Rule 8–501(c) does not excuse the failure to furnish in the brief references to factual material in support of a party's argument as required by Rule 8–504(a)(4). Nor does the liberalization in Rule 8–501(c) alter the fundamental rule of appellate practice under which the appellate court has no duty independently to search through the record for error.

*Id.* (footnote deleted); *see also State Roads Comm'n v. Halle,* 228 Md. 24, 26–27, 178 A.2d 319, 320 (1962) (holding that the Court had no obligation to search large record extract); [1]

---

1. In *State Roads Comm'n v. Halle,* 228 Md. 24, 26–27, 178 A.2d 319, 320 (1962), this Court said

*Pulte Home Corp. v. Parex, Inc.,* 174 Md.App. 681, 760, 923 A.2d 971, 1016 (2007) (stating "We decline to comb through the eight-volume, 3,876–page record extract to ascertain information that Parex should have provided[.]").

Here, MRA apparently expected that the Court would have searched six volumes of record extracts from previous cases, in addition to the four volumes in the current cases (Nos. 143 and 144), to find evidence that was not referred to in its brief. This is not a realistic expectation, and we decline to consider the evidence from these other records at this late date. We hasten to say, however, that in declining to consider this newly proffered evidence, we do not suggest that, had we considered that evidence, our conclusion on the zoning estoppel issue would be different. As we state in the opinion, "Maryland has maintained a stricter stance than most other states in protecting government's right to downzone in the face of planned construction[,]" and we approach zoning estoppel with "utmost caution." Op. at 57–58, 994 A.2d at 875–76.

The other contentions advanced by MRA in its Motion for Consideration are already addressed in our original Opinion.

The Court will correct its majority opinion on page 63–64, 994 A.2d at 879, to say that it searched the "record extract," not the entire "record."

For these reasons, Petitioner's Motion for Reconsideration is denied.

Chief Judge BELL and Judge HARRELL did not participate in the consideration of this opinion.

---

In its statement of facts and in its argument, when referring to facts and/or objections to evidence, sometimes the location thereof in the record extract is given and at other times not, with little, if any, attempt being made to pin point in the record extract where and in what mode objections were properly reserved for decision on appeal. With a record extract of more than 300 pages, this places an undue burden upon the Court (and also violates Maryland Rule 831(c)(3)) by necessitating, if the questions are to be answered, an attempt to piece together, from the whole record extract, what the questions are, and whether they have been sufficiently reserved for decision.